**Walter MILLER, Petitioner,**

v.

**Tekla MILLER, Respondent.**

**No. 90–CV–72890–DT.**

United States District Court,
E.D. Michigan, S.D.

Feb. 11, 1992.

---

**13.** *Id.* at 59, lines 18–20.

**14.** *Id.* at 56–60.

**15.** Joshi Aff. at para. 14.

**16.** Plaintiffs' Resp. at para. 30.

Douglas R. Mullkoff, Ann Arbor, Mich., for petitioner.

Timothy Baughman, Asst. Pros. Atty., Detroit, Mich., for respondent.

## OPINION

GILMORE, District Judge.

This matter is before the Court upon a petition for writ of habeas corpus. Petitioner argues, *inter alia,* that the trial court erred in permitting the unredacted confession of his codefendant to be admitted as substantive evidence against him.

The matter was referred to Magistrate Judge Paul J. Komives, who submitted a report and recommendation that the petition for habeas corpus be denied. After careful consideration of the evidentiary and constitutional issues involved, the Court concludes that although there was error in the trial the error was harmless and, therefore, the writ of habeas corpus should be denied.

I

The trial of this case was held in Detroit Recorder's Court on August 26, 1986. Petitioner was tried with co-defendants Kerry Jordan, Michael Hunter, Christian Phillips and Donald Watkins. It was established at trial that these defendants went to retrieve a gun at a neighborhood house and, on the way back from picking up the gun, saw an individual named Bernard Payne. Petitioner, Jordan and Watkins forced Payne at gunpoint into an automobile being driven by Phillips. The defendants then took Payne into the basement of a house and told him to page his friend Desmond Wilbert, whom the defendants wished to kill because Wilbert was competing for cocaine sales on the west side of Detroit.

Payne paged Wilbert and told him to meet at the address of a nearby house. Four of the defendants, including Petitioner, went to await Wilbert's arrival. Although they missed Wilbert at that time, Hunter directed Payne to page Wilbert again, and on the second page the defendants spotted Wilbert's car. While Petitioner remained in the car, Phillips, Watkins and Jordan got out and opened fire on Wilbert's car. Wilbert was able to escape, but a passenger in Wilbert's car, Voncie Johnson, was killed.

Several months later, all five defendants were apprehended for the murder of Johnson, the attempted murder of Wilbert, and the kidnapping of Payne. Under police questioning and after *Miranda* warnings had been given to defendants Jordan and Petitioner, both confessed.[1] In their confessions, Jordan and Petitioner implicated

---

**1.** The confessions are set forth in their entirety    in the appendix to this opinion.

each other as well as the other defendants. When asked why he was confessing, Jordan stated it was "[b]ecause I'm not going to take the fall alone."

Although there are some factual discrepancies between Jordan's and Petitioner's respective confessions, the confessions are virtually identical in the description of inculpating behavior, with one significant exception. Jordan's confession places Petitioner in the basement at the earliest stages of the planning of the murder, *i.e.*, when Payne was directed to page Wilbert, whereas Petitioner's confession provides that he was elsewhere in the house and was not present in the basement during the questioning of Payne.

Before trial, Jordan and Petitioner moved to suppress their confessions, both claiming the police had promised leniency in exchange for implicating other members of the group. Judge Henry Heading of Recorder's Court denied their motions, determining that the confessions were voluntarily given after proper *Miranda* warnings.

At trial, the State moved for admission of the confessions under Michigan Rule of Evidence 804(b)(3), which provides a hearsay exception for declarations against interest. At a hearing outside the presence of the jury, Recorder's Court Judge Michael Talbot held that the confessions were properly admitted under that exception. The State then used both confessions as substantive evidence against all five defendants. None of the defendants testified. Bernard Payne testified against the defendants and stated that Petitioner was in the basement while Payne was being questioned.

Petitioner and his co-defendants were convicted, and Petitioner was sentenced to life in prison for first degree murder and assault with intent to murder, 30 to 60 years for kidnapping, and two years for felony firearms. On July 17, 1989, Petitioner's conviction and that of the four other defendants was affirmed by the Michigan Court of Appeals in *People v. Watkins*, 178 Mich.App. 439, 444 N.W.2d 201 (1989). On July 18, 1990, the Michigan Supreme Court denied leave to appeal as to Petitioner and Jordan, but granted leave to appeal as to Watkins, Hunter and Phillips. The appeal was granted upon the sole issue of determining whether the Court erred in admitting as substantive evidence the incriminating statements of non-testifying defendants Jordan and Petitioner, and, if that was error, whether the error was harmless.

On September 19, 1991, the Michigan Supreme Court issued a voluminous opinion holding that it was error to introduce as substantive evidence against Watkins, Hunter and Phillips, the confessions of the non-testifying defendants Jordan and Petitioner. *People v. Watkins*, 438 Mich. 627, 666, 475 N.W.2d 727 (1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 933, 117 L.Ed.2d 105 (1992). The Court determined that those sections of the confessions which inculpated co-defendants were not admissible under MRE 804(b)(3), as statements against interest. The Court concluded that the sections inculpating co-defendants represented unreliable accusatory statements properly excluded as hearsay, and stated that admission of the same violated the appellants' rights under the U.S. Constitution. *Id.* 438 Mich. at 649, 475 N.W.2d 727. The Court reversed the convictions and remanded the case for retrial without the inadmissible hearsay. *Id.* at 667, 475 N.W.2d 727.

On September 28, 1990, Petitioner filed for habeas corpus relief. Petitioner now contends that the rationale of the Michigan Supreme Court in *Watkins, supra,* applies with equal force to Petitioner and compels the reversal of Petitioner's conviction. Petitioner claims that it was error to admit under MRE 804(b)(3), those sections of Jordan's confession which inculpated Petitioner. Such statements, Petitioner asserts, were not against Jordan's interest and thus not within the exception to the rule excluding hearsay.

Petitioner also disagrees with the characterization of his and Jordan's confessions as interlocking. Petitioner cites numerous points upon which the two confessions differ both in detail and substance. Indeed, even if the two confessions were deemed

interlocking, Petitioner argues that the interlocking nature of the confessions is not a proper basis to admit the statements.

Finally, Petitioner argues that the error in admitting Jordan's confession was not harmless because the confession affected the jury's verdict. Petitioner notes that during deliberation, the jury specifically asked for and received copies of Jordan's and Petitioner's confessions for re-examination.

## II

The primary issue before the Court is whether it was error to admit Jordan's confession as substantive evidence against Petitioner, and, if it was error, whether the error was harmless.[2] Resolution of these questions necessitates an inquiry into the protection afforded Petitioner by the sixth amendment to the U.S. Constitution.

■ The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...." U.S. Const., Am. VI. The truthfinding function served by this confrontation clause protection is undoubtedly threatened when an accomplice's confession is introduced against a criminal defendant without the opportunity for that defendant to conduct cross-examination.

■ In *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Court held that a defendant's sixth amendment right to confrontation was violated when the inculpating confession of the defendant's non-testifying accomplice was introduced at their joint trial, even though the jury was instructed to consider the confession against only the co-defendant. This constitutional precaution was later extended in *Cruz v. New York*, 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987). In *Cruz*, the Court held that where a non-testifying co-defendant's confession

facially incriminating the defendant is not directly admissible against the defendant, the confrontation clause bars the admission of the confession even if the jury is instructed not to consider it against the defendant and even if the defendant's own confession of an equally incriminating nature is admitted against him. *Id.* at 193, 107 S.Ct. at 1719.

*Bruton* and *Cruz* form the backdrop for consideration of Petitioner's habeas petition. However, each of these cases includes an implied or explicit exception to its holding for instances where a co-defendant's accusatory statements are admissible as substantive evidence against the accused. The present case falls beyond the scope of *Bruton* and *Cruz* in that the confessions were admitted directly against the defendants as substantive evidence.

In *Lee v. Illinois*, 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986), the Supreme Court addressed the circumstances under which the admission as substantive evidence of a co-defendant's confession violates the confrontation clause. The Court held that the confession of an accomplice which inculpates the accused is presumptively unreliable and can be admitted as substantive evidence only under certain conditions. Citing *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the Court stated that the hearsay evidence could overcome the presumption of unreliability only if it fell within a firmly rooted hearsay exception or was supported by a showing of particularized guarantees of trustworthiness. *Lee, supra*, 476 U.S. at 543–44, 106 S.Ct. at 2063–64.

■ The task for this Court, therefore, is to determine whether Jordan's confession was properly admitted under a firmly rooted hearsay exception or whether the confession was shown to have other particularized guarantees of trustworthiness for its admission as substantive evidence against

---

**2.** The Court notes that in addition to the confrontation clause claim, Petitioner requested habeas corpus relief based upon arguments that the confession was not voluntary, the Michigan speedy trial rule was violated, the jury instructions improperly favored the prosecution and

the Prosecutor misstated the evidence in closing argument. However, the Court finds no merit to any of these arguments and adopts the analysis of Magistrate Komives' report and recommendation denying these as grounds for a grant of habeas corpus relief.

Petitioner. If the confession does not come within either of these categories, then admitting Jordan's confession violated Petitioner's sixth amendment rights.

■ The trial court determined that Jordan's and Petitioner's confessions were admissible as substantive evidence against all the defendants because they were statements against interest as provided in MRE 804(b)(3). The Michigan Supreme Court reversed, concluding that the confessions were not statements against interest. This Court agrees with the Michigan Supreme Court and holds that it was error to admit Jordan's confession against Petitioner under MRE 804(b)(3).

Michigan Rule of Evidence 804(b)(3) permits the admission of hearsay statements that are against the declarant's interest. The Rule defines a statement against interest as follows:

> ... A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable person in his position would not have made the statement unless he believed it to be true....[3]

Section 804(b)(3) is premised upon the belief that a statement against a declarant's interest is likely to be sincere and accurate. However, this reasoning applies only to those statements which are truly against the declarant's interest.

The portion of Jordan's confession properly deemed a statement against interest is strictly limited to those declarations which implicate Jordan. Those portions of Jordan's statement which implicate others, including Petitioner, are not declarations against Jordan's interest. Indeed, it is more likely that such inculpation is *in* Jor-

dan's interest. As the Supreme Court recognized in *Lee:*

> The true danger inherent in this type of hearsay [a codefendant confession inculpating the accused] is, in fact, its selective reliability. As we have consistently recognized, a codefendant's confession is presumptively unreliable as to the passages detailing the defendant's conduct or culpability because those passages may well be the product of the codefendant's desire to shift or spread blame, curry favor, avenge himself, or divert attention to another.

*Lee, supra,* 476 U.S. at 545, 106 S.Ct. at 2064. To conclude that Jordan's statement inculpating Petitioner was against Jordan's interest would be to ignore "a reality of the criminal process, namely, that once partners in a crime recognize that the 'jig is up,' they tend to lose any identity of interest and immediately become antagonists, rather than accomplices." *Id.* at 544–45, 106 S.Ct. at 2064. In sum, Jordan's confession inculpating Petitioner should not have been admitted as a statement against interest.[4]

The Court concludes that Jordan's confession inculpating Petitioner does not fall under a firmly rooted hearsay exception and does not overcome the presumption of unreliability. Therefore, Jordan's confession cannot be admitted without violating Petitioner's Sixth Amendment rights unless the confession is shown to have particularized guarantees of trustworthiness.

■ The Supreme Court recently discussed what showing must be made to provide particularized guarantees of trustworthiness. In *Idaho v. Wright,* — U.S. —, —, 110 S.Ct. 3139, 3150, 111 L.Ed.2d 638, 656 (1990), the Court stated:

> ... unless an affirmative reason, arising from the circumstances in which the

**3.** This rule is virtually identical to Federal Rule of Evidence 804(b)(3), the only difference being that the Michigan rule refers to a "reasonable person," whereas the federal rule refers to a "reasonable man."

**4.** Holding that Jordan's confession does not fall under MRE 804(b)(3), makes it unnecessary for this Court to address the question of whether

this is a "firmly rooted" hearsay exception for purposes of Sixth Amendment analysis. However, the Court notes that the declaration against penal interest exception has been considered a firmly rooted hearsay exception by other courts. *See e.g., United States v. York,* 933 F.2d 1343 (7th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 321, 116 L.Ed.2d 262 (1991).

statement was made, provides a basis for rebutting the presumption that a hearsay statement is not worthy of reliance at trial, the Confrontation Clause requires exclusion of the out-of-court statement . . .

Rather than providing an affirmative reason to find trustworthiness, the circumstances surrounding Jordan's confession provide an affirmative reason to question the veracity of Jordan's hearsay statements.

First of all, Jordan made the statement while in police custody. Courts have traditionally viewed arrest confessions with special suspicion. *Lee, supra,* 476 U.S. at 541, 106 S.Ct. at 2062. Furthermore, while giving his statement, Jordan was asked why he was providing the confession. In response, Jordan stated that it was "[b]ecause I'm not going to take the fall alone." This explanation does not dispel concern about Jordan's possible motive for inculpating others. Instead, this bold admission heightens concern about the trustworthiness of those portions incriminating his co-defendants. The circumstances in which Jordan made his statement expose his confession as the kind of inherently suspect and unreliable accusatory statement properly excluded as hearsay.

■ Respondent makes the argument that the interlocking nature of Jordan's and Petitioner's confessions provides the particularized guarantee of trustworthiness necessary to warrant admission. The Court finds, however, that the interlock between the confessions does not provide a basis for admitting Jordan's confession against Petitioner. As the Court stated in *Wright, supra,* 110 S.Ct. at 3148.

> . . . particularized guarantees of trustworthiness must be shown from the totality of the circumstances, but we think the relevant circumstances include only those that surround the making of the statement and that render the declarant particularly worth of belief.

Thus, the Court limited a finding of particularized guarantees of trustworthiness to the circumstances surrounding the giving of the statement itself, and excluded reference to other evidence presented at trial. The Supreme Court explained this limitation as follows:

> . . . the use of corroborating evidence to support a hearsay statement's "particularized guarantees of trustworthiness" would permit admission of a presumptively unreliable statement by bootstrapping on the trustworthiness of other evidence at trial, a result we think at odds with the requirement that hearsay evidence admitted under the Confrontation Clause be so trustworthy that cross-examination of the declarant would be of marginal utility.

*Id.* 110 S.Ct. at 3150.

Therefore, the interlocking nature of Jordan's and Petitioner's confessions cannot be used to "bootstrap" Jordan's presumptively unreliable hearsay to trustworthiness. The trustworthiness inquiry is limited to the totality of the circumstances that surround the making of Jordan's statements and, as discussed above, those circumstances do not establish that Jordan's statement is particularly worthy of belief.

■ Yet even if this Court were to consider the interlocking nature of Jordan's and Petitioner's confessions, the Court would still conclude that this does not provide any guarantee of trustworthiness. Co-defendant confessions are to be viewed skeptically precisely because they suffer from *selective* reliability. *Lee, supra,* 476 U.S. at 545, 106 S.Ct. at 2064. Although a great many aspects of two co-defendants' confessions may interlock, the areas of discrepancy are often the very areas where blame is shifted and culpability avoided. As the Supreme Court stated in *Lee:*

> If those portions of the codefendant's purportedly "interlocking" statement which bear to any significant degree on the defendant's participation in the crime are not thoroughly substantiated by the defendant's own confession, the admission of the statement poses too serious a threat to the accuracy of the verdict to be countenanced by the Sixth Amendment. In other words, when the discrepancies between the statement are not

insignificant, the codefendant's confession may not be admitted.

*Lee, supra,* 476 U.S. at 545, 106 S.Ct. at 2064.

In *Lee,* the Court examined two confessions that overlapped to a great extent but diverged with respect to the defendant's participation in the planning of the murder and certain circumstances relevant to the defendant's premeditation. This being so, the Court concluded that the discrepancies were too great to permit the admission of the co-defendant's confession. *Id.* at 545–46, 106 S.Ct. at 2064–65.

Similarly, the two confessions in the present case have a great many interlocking parts. However, they differ as to when Petitioner became involved and what Petitioner's level of involvement was. Therefore, the discrepancies are not "insignificant," and the confession cannot be admitted.

In sum, the Court concludes that Jordan's statements inculpating Petitioner do not fall within any firmly rooted hearsay exception and do not have particularized guarantees of trustworthiness so as to be admissible for confrontation clause purposes. It was therefore error to admit Jordan's unredacted confession against Petitioner. The error in admitting Jordan's confession against Petitioner was of the same constitutional proportions as the error cited in *Watkins, supra,* involving the admission of Jordan's and Petitioner's confessions against the other three defendants.

### IV

Although the Court has concluded that admitting Jordan's confession as evidence against Petitioner was error, the Court must now consider whether that error was harmless. As the Supreme Court noted in *Bruton,* "[a] defendant is entitled to a fair trial but not a perfect one." *Bruton, su-*

*pra,* 391 U.S. at 135, 88 S.Ct. at 1627 (quoting *Lutwak v. U.S.,* 344 U.S. 604, 619, 73 S.Ct. 481, 490, 97 L.Ed. 593 (1953)). In light of this consideration, the Supreme Court crafted the harmless error doctrine for constitutional errors in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In *Chapman,* the Court held that for a constitutional error to be harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt. *Id.* at 24, 87 S.Ct. at 828.

In *Watkins,* the Michigan Supreme Court held that the error in admitting Jordan's and Petitioner's confessions as evidence against the other three co-defendants was not harmless beyond a reasonable doubt.[5] The Court noted that the jury showed specific concern with the erroneously admitted evidence by requesting to reexamine the confessions during deliberation. *Watkins, supra,* 438 Mich. at 667, 475 N.W.2d 727.

Although Petitioner makes the same argument for harmless error in his petition, Petitioner's argument is not nearly as convincing. There is a significant difference between the effects of the constitutional error in Petitioner's case and the error identified as to Petitioner's three co-defendants. Petitioner himself had confessed; the other three defendants had not.[6] Thus, there is a much more compelling argument that admitting Jordan's inculpating statements against Petitioner was harmless error.

The Court has already mentioned that the interlocking nature of Jordan's and Petitioner's confessions could not be used to measure the reliability of the respective confessions. However, the interlock between the two confessions, as well as other evidence presented at trial, can be considered in harmless error analy-

5. In making this determination, the Michigan Supreme Court applied Michigan's harmless error rule which requires that the appellate court be able to confidently conclude, beyond any reasonable doubt, that the error did not affect the jury's verdict. *See People v. Robinson,* 386 Mich. 551, 563, 194 N.W.2d 709 (1972).

6. Defendant Watkins also confessed, but his confession was not admitted at trial because the trial court determined that it was inconsistent and untrustworthy.

sis. *Wright, supra*, —— U.S. at ——, 110 S.Ct. at 3150–3151, 111 L.Ed.2d at 658; *Cruz, supra*, 481 U.S. at 194, 107 S.Ct. at 1719; *Lee, supra*, 476 U.S. at 547, 106 S.Ct. at 2065. Because those portions of Jordan's confession which inculpate Petitioner are either substantiated by Petitioner's own confession or by other evidence submitted at trial, the Court concludes that the error in admitting Jordan's confession was harmless beyond a reasonable doubt.

First of all, the great majority of discrepancies between Jordan's and Petitioner's confessions are immaterial details. The one significant difference between the confessions concerns Petitioner's presence in the basement where the killing was planned. However, there was other evidence, specifically the testimony of Bernard Payne, that established Petitioner's presence in the basement when Payne was first questioned. Moreover, Petitioner admitted in his own confession that he knew of the plan to kill Wilbert before he drove the co-defendants in search of Wilbert's car. Petitioner's confession also described his participation in the kidnapping of Payne at gunpoint. Thus, Petitioner's own confession provided sufficient evidence to support convictions on the kidnapping, first degree murder, assault with intent to murder and felony firearm charges. The Court is convinced beyond a reasonable doubt that Petitioner's conviction on those counts would not have been altered in the least even if Jordan's confession had been excluded.

The fact that the jury requested to see both Jordan's and Petitioner's confessions during deliberation does not change the above analysis. As the Court pointed out in *Schneble v. Florida*, 405 U.S. 427, 432, 92 S.Ct. 1056, 1060, 31 L.Ed.2d 340 (1972):

> ... we conclude that the minds of an average jury would not have found the state's case significantly less persuasive had the testimony as to Schneble's admissions been excluded. The admission into evidence of these statements, therefore, was at most harmless error.

Those observations apply with equal strength to the admission of Jordan's confession in this case. The Court finds beyond a reasonable doubt that the jury would have rendered the same verdict against Petitioner even if Jordan's confession had been properly excluded.

### V

The Court finds that although the admission of co-defendant Jordan's confession at Petitioner's trial was error, the error was harmless. Furthermore, the Court finds no other grounds upon which to grant habeas corpus relief. Therefore, the PETITION FOR WRIT OF HABEAS CORPUS submitted in this case is DENIED.

IT IS SO ORDERED.

### APPENDIX A

The defendants are repeatedly referred to in Jordan's and Miller's statements by the following nicknames:

WENDALL HENRY—"FARMER"
DONALD WATKINS—"DUCK"
KERRY JORDAN—"K–9"
DESMOND WILBERT—"D or DES"
MICHAEL HUNTER—"B" or "BAM"
CHRISTIAN PHILLIPS—"CHRIS"
WALTER MILLER—"PETER–PAUL"
BERNARD PAYNE—"NARD"

The jury considered the following confession from Kerry Jordan:

"*Q.* Mr. Jordan, Have I explained your constitutional rights to you?

"*A.* Yes

"*Q.* Do you understand them?

"*A.* Yes.

"*Q.* Are you willing to give me a statement regarding the fatal shooting of Voncie Johnson which occurred on [8]–26–86 on Cloverlawn?

"*A.* Yes.

"*Q.* Are you giving the statement freely and voluntarily?

"*A.* Yes.

"*Q.* Have I or any officer threatened you or promised you anything?

"*A.* No.

"*Q.* Why are you telling me?

"*A.* Because I'm not going to take the fall alone.

"*Q.* Tell me what happened.

"*A.* A guy, Cliff owed me a pistol. He used to work for me and quit coming around. Duck, another guy who worked for me came over to 9555 Pinehurst and said that Cliff was at home. Then me, Peter–Paul, Chris went in a black [C]ougar and drove over to Cliff's house. Duck and another guy followed us in their car. We got the gun from Cliff and Duck got in the car with us. Duck said, 'I just saw Nard go to the store, we should get him.' We parked the car and waited for Nard. Peter–Paul and Chris got out of the car with Duck. They waited by the alley for Nard and brought him back to the car.

"*Q.* Were they armed?

"*A.* Yes, Chris had an Uzi, Duck had the gun we got from Cliff, Peter–Paul didn't have anything.

"*Q.* Okay, continue.

"*A.* When we got him to the car Duck and Chris, no Duck and Peter–Paul got in the back seat with him. They made him bend over and we went back to 9555 Pinehurst. We all went into the basement and they questioned him. They were questioning him about a guy name[d] D. I went outside. Then B came to the house. I told B we got Nard in the basement and we went downstairs. B asked Nard something but I don't remember what. Nard said I'll beep D because he didn't want us to kill him. Duck said come on, let's go beep him. Me, Chris, Peter–Paul, Duck and Nard drove over to the Mendota and Nard beeped D.

"*Q.* Who lives on Mendota?

"*A.* A friend of ours, Mary.

"*Q.* Okay, continue.

"*A.* Chris gave Nard an address off the top of his head on Cloverlawn and Nard gave it to D. B was there with us. After we made the call, me, Chris, Duck, Peter–Paul and Nard went on Cloverlawn. At first we just drove down the street. We saw D parked near Tireman. He was pull-

ing off and we were behind him. We went back to Mendota and Nard beeped him again. I don't remember if B was there or not. After Nard called, we went back on Cloverlawn, me, Chris, Peter–Paul, Duck and Nard and parked. We gave him another address this time. Me, Chris, Duck and Nard got out of the car. We told Nard to go and stand in front of the address we gave D. We waited about twenty or thirty minutes and decided to leave because it was raining a little bit and D had not showed up. We all got back into the car and started to leave and that's when we saw D. We came around the block and parked on the side street, I think it was Belton; but I'm not sure. Me, Chris and Duck got out. Me and Chris went to one side of the street. Duck was on the other. We were walking towards D. He was on Duck's side of the street coming off the porch. D went to get in his car. That's when the shooting started. D took off in his car. We went back to our car and went back on Pinehurst. Duck and Nard got out and we got out for a while. Then me, Peter–Paul and Chris left.

"*Q.* Was D alone in the car?

"*A.* Now [sic], there was another guy in the car with him.

"*Q.* Did D or the other guy return fire?

"*A.* I don't think so.

"*Q.* What kind of gun did you, Duck and Chris have?

"*A.* Me and Chris had Uzi's, Duck had a .357 mag, the gun we got from Cliff.

"*Q.* Why did you guys want to kill D?

"*A.* Because Nard was working with us, then he quit us and was working for D. It was really Duck who wanted him.

"*Q.* What happened to the guns?

"*A.* I threw mine away on State Fair, near Cameron. I don't know what Chris or Duck did with theirs.

"*Q.* How many shots did you fire?

"*A.* I'd say about ten.

"*Q.* How far away from D were you?

"*A.* About five or ten yards away.

"*Q.* Did B know what was going down?

"A. Yes.

"Q. What are the names of the following people?

"1. K–9? That's me.

"2. Duck? I don't know but he stays on Cameron.

"3. Chris? I don't know his name either. He stays in Woodingham.

"4. B? We call him Bam. I don't know where he stays.

"5. Peter–Paul? His first name is Walter. I don't know where he lives.

"Q. Have you read your statement.

"A. Yes.

"Q. Are there any corrections?

"A. Yes, when we picked up Nard, Duck stayed in the car, Chris and Peter–Paul got out. Chris had the Uzi, Peter–Paul had the .357."

## APPENDIX B

The jury considered the following confession from Walter Miller. (See Appendix A as a guide for the nicknames used throughout the statement.)

"Q. Mr. Miller, have I explained your Constitutional Rights to you?

"A. Yes.

"Q. Do you understand them?

"A. Yes.

"Q. Have I or has any police officer threatened you or promised you anything?

"A. No.

"Q. Are you willing to give me a statement regarding the fatal shooting of Voncie Johnson which occurred 8–26–86 on Cloverlawn in the City of Detroit?

"A. Yes I am.

"Q. Are you giving me this statement freely and voluntarily?

"A. Yes.

"Q. Tell me what happened on that date.

"A. A guy named Cliff and some other guy were working for Farmer, both of them quit working for Farmer about four months before he, Farmer got killed. When they quit working for us they kept a .357 revolver, which was a house gun for the East side house that they ran. On the day the shooting happened, Duck came over to 9555 Pinehurst and said that Cliff wanted to give the gun back to us. B, Michael instructed us to get the gun. Me, Chris Phillips, K–9, Kerry, went in a black [C]ougar, I think it's a 1979, over to Cliff's house. Duck and a guy who I don't know got into a blue car and led the way to Cliff's. When we got to Cliff's he was on the porch, K–9 got the gun from him, then Cliff's mother came out and came up to our car and said hello. Before we left Duck got out the car he was in and got into our car. After we got the gun we left.

"Q. Was anyone in the car armed before Cliff gave you the revolver?

"A. Yes, K–9 had a Mack–10, Christian Phillips had a Uzi 9 mm, I was unarmed, and Duck got the .357 from Cliff; but it wasn't loaded. The rest of the guns were loaded.

"Q. Okay, continue.

"A. We were just going around the block when Duck spotted a gun [sic] who was walking out of a store. Duck said, that's, then he said the guy's name; but I don't remember the name. We turned the corner and pulled over. Chris and me got out of the car and walked to an alley. Chris got behind a garbage dumpster and I was in front of it. The guy who was walking came across the street and started turning into the alley when I stopped him. I said don't move. The guy stopped and said don't kill me. Chris jumped out and was standing behind me. I grabbed the guy and walked him to the car and put him in the back seat with Duck, then I got in the back seat with him.

"Q. Were either you or Chris armed?

"A. Yes, I had the .357, it was unloaded, Chris had the Uzi.

"Q. Okay, continue.

"A. When we got the guy into the back seat, I told him to lady [sic] down on the floor and he did and we went back to 9555 Pinehurst. When we got there Chris, K–9 and Duck took him into the basement. I

went upstairs and took care of a customer. B was not at the house when we first arrived, either Chris or K–9 went down the street, found B and told him what had happened. B then came back to the house with either Chris or K–9 and went into the basement. I was still upstairs with the customer; but when B arrived I went downstairs to see, to see what he had to say. Me, Chris and B were in one part of the basement talking about what happened. We told him about us going over there and getting the gun, and bringing the guy back with us. I went back upstairs with the customer and they all stayed downstairs. I could hear them talking; but I couldn't hear what they were actually saying. Chris, K–9, B and Duck and the other guy left. They were gone for about five minutes and they all came back. They stood at the side of the house and were talking, by that time I was walking the customer to the door, she left and the guys got back into the [sic] and left again. About three to five minutes later a guy I know as C came over, I asked him if he knew where the guys were and he told me that they were around the corner. I left 9555 Pinehurst and went over to Mendota where they were. When I got to Mendota I went up on the porch and Chris, K–9, B, Duck and the other guy sat on the porch talking about the guy who had beeped, all I remember is that the guy said he was waiting for someone to call him back.

"*Q.* Okay, continue.

"*A.* We stayed on the porch for about fifteen minutes, and I went back on Pinehurst to check on the house, and then went back to Mendota. Everyone was still on the porch and I joined them. The guy finally called, when he called I was back on Pinehurst checking the house. I went back on Mendota and got the car and went and bought some gas and returned to Pinehurst. Everyone was there, Chris, B, K–9, Duck and the other guy. I parked the car and me, Chris, K–9 and B just started walking down the street and talking. That's when I found out what was going down. B told me to get into the car and

drive to Mendota and Westfield with the guy, and wait. I went back to Pinehurst, got the guy, put him in the car and went to where B told me to go. I parked the car and waited for about five to ten minutes. Chris, K–9, and Duck came and got into the car, Chris told me to drive over on Cloverlawn because we were going on a mission and that we were going to meet the guy on Cloverlawn. I drove to Cloverlawn between Belton and Tireman, when we got there the guy who I took out of the Pinehurst house pointed out a little red car and said that's them. They [sic] guy was coming off of the porch and was getting into his car, I speeded up to try to catch up with him, but he pulled off. He made a right on Tireman and circled the block. I tried to follow him but lost him. I caught back up with him on the sidestreet off of Tireman. I followed him and stopped on Brighton and Majestic. Chris, K–9 and Duck got out of the car and started to walk up Majestic towards the red car. Duck went into the alley. Chris and K–9 stayed on the sidestreet. By the time they got there the guy was gone. They came back into the car and I tried to follow the guy; but I lost him. We went back on Mendota, Chris, K–9, Duck and the other guy went inside, I drove off and went and made a phone call. I went back to the house on Mendota, and stood on the porch. All of them came out, Chris, K–9, Duck, B and the guy. B was mad. He didn't say anything but by knowing him I could tell he was mad. Chris or K–9 said let's go and I got back in the car with Chris, K–9, Duck and the other guy. Chris told me to go back on Cloverlawn and that they called the guy again and had given him another address. I drove to Cloverlawn and the red car wasn't there. We sat there for about five minutes and pulled off. I drove back to Joy [R]oad, while driving east on Joy [R]oad we spotted the red car going west, by the railroad tracks. I turned on Alpine then right on Tireman, then to Roselawn. When I got to Roselawn and Belton, we saw the red car making a right onto Belton then another right onto Northlawn, heading to Joy [R]oad. I turned left on Belton to Cloverlawn then turned on Cloverlawn I proceed-

ed towards Joy [R]oad. While driving down Cloverlawn I saw the red car on Mackenzie, I made a left on Joy [R]oad, Chris, K–9 and Duck were out of the car by this time. I dropped them off on Cloverlawn by the alley, I went into a lot on Northlawn and Joy [R]oad, turned around then made a left on Joy [R]oad and picked all three of them up at Cloverlawn and Joy [R]oad. Once they got into the car I drove to Roselawn and made a right, going back to Tireman, then another right on Belton. I cruised up to the alley with the lights off and stopped. Chris, K–9 and Duck got out of the car and walked up to Cloverlawn. Before they got out either Chris or K–9 told me to wait and that I was to crash into the red car if they tried to get away. As they were walking away from our car I heard someone say, he turned around. I proceeded up Belton to Northlawn then to Mackenzie, turned and parked on the corner of Cloverlawn and Mackenzie. I saw the red car, it was like in the middle of the block. By the time I parked the shooting started. The red car pulled off, I realized that I wasn't where I was supposed to be and pulled off behind him. The red car made a left on Tireman, I stopped on Cloverlawn and Belton and picked up Chris, K–9 and Duck. We tried to chase the car but he got away. We went back to the house, Wykes, that's where we followed him to earlier, but he wasn't there. Then we went back to Mendota, Chris, K–9, Duck and the other guy got out. I went and made another phone call and then went back to Mendota. Everyone was on the porch, Chris, K–9, Duck, B and the other guy. They took the car and told me to meet them back on Pinehurst. I walked back to Pinehurst, 9555, we all went inside and talked about what happened. Everyone was mad at me and blamed me for missing the guy. B told me you better start learning how to think. The guy who I didn't know said you just signed my death warrant. We also discussed what to do with the guy who I didn't know. B said to let him go. I left and went to my mother's house. Everyone was still on Pinehurst when I left.

"Q. What type of weapons did the three guys have who did the shooting?

"A. Chris and K–9 had Uzi's, Duck had the .357.

"Q. Who loaded the .357?

"A. I don't know but before Duck left the car he checked it and said it was loaded.

"Q. Did you fire any shots?

"A. No I did not.

"Q. Do you know [why] the hit was ordered?

"A. No I don't.

"Q. Who ordered it?

"A. B is the boss and he would have had to order the hit or approve of it.

"Q. Could you tell [how] many people were in the red car?

"A. Two men.

"Q. Do you have a nickname?

"A. Yes, Peter–Paul.

"Q. How many shots were fired?

"A. No I don't.

"Q. Do you know who the men in the red car were?

"A. No I don't.

"Q. What relationship between you, Chris, K–9, Duck and B, Michael?

"A. Me, Chris and B grew up knowing each other. I met K–9 after I got with the crew and that's also when I met Duck. B was in the narcotics business. He was an underboss enforcer for and body guard for Farmer, he's the guy who got killed on the expressway, Wendell Henry. After he got killed, B kind of took over Farmer's action, he was still working for someone, but I don't know who. Me, Chris, K–9, were the enforcers for B. An enforcer is a person who makes sure everything is going all right, and who straightens things out if there [sic] not.

"Q. Do you know what happened to the guns that were used?

"A. They were kept by the guys who had them.

"Q. Have you read the statement?

"*A.* Yes I have.

"*Q.* Are there any additions or corrections you want made?

"*A.* The only other thing is that it was not a planned hit for that day, we were only supposed to get the gun, the rest just happened afterwards.

"*Q.* If a hit would be planned ahead of time, would you be informed of it?

"*A.* No, that would be between B, Chris, and K–9, all I would do is drive, and I wouldn't find out until it was about to happen."