OPINION OF THE SUPREME COURT OF NEBRASKA

NOTICE: DUE TO UNFORESEEN CIRCUMSTANCES, THIS OPINION IS BEING POSTED
TEMPORARILY IN "SLIP" OPINION FORM. IT WILL BE REPLACED AT A LATER
DATE WITH AN "ADVANCE" OPINION, WHICH WILL INCLUDE A CITATION.


Case Title

STATE OF NEBRASKA, APPELLEE,
V.
TIMOTHY J. BRITT, APPELLANT.


Case Caption

STATE V. BRITT


Filed April 22, 2016.    No. S-14-551.


Appeal from the District Court for Douglas County: KIMBERLY MILLER PANKONIN, Judge. Reversed and remanded.

Michael J. Wilson and Glenn Shapiro, of Schaefer Shapiro, L.L.P., for appellant.

Douglas J. Peterson, Attorney General, and Melissa R. Vincent for appellee.

STATE v. BRITT

Filed April 22, 2016.   No. S-14-551.

1. **Rules of Evidence: Hearsay: Appeal and Error.** Apart from rulings under the residual hearsay exception, an appellate court reviews for clear error the factual findings underpinning a trial court's hearsay ruling and review de novo the court's ultimate determination to admit evidence over a hearsay objection.

2. **Trial: Evidence.** Regardless of whether the proponent or the trial court articulated no theory or the wrong theory of admissibility, an appellate court may affirm the ultimate correctness of the trial court's admission of the evidence under any theory supported by the record, so long as both parties had a fair opportunity to develop the record and the circumstances otherwise would make it fair to do so.

3. **Rules of Evidence: Conspiracy.** Under Neb. Rev. Stat. § 27-801(4)(b)(v) (Reissue 2008), a statement is excluded as nonhearsay if it is more likely than not that (1) a conspiracy existed, (2) the declarant was a member of the conspiracy, (3) the party against whom the assertion is offered was a member of the conspiracy, (4) the assertion was made during the course of the conspiracy, and (5) the assertion was made in furtherance of the conspiracy.

4. **Conspiracy.** The declarant conspirator who partners with others in the commission of a crime is considered the agent of his or her fellow conspirators, and the commonality of interests gives some assurance that the statements are reliable.

5. ____. It is well established that a conspiracy is ongoing--such that statements are considered made during the course of the conspiracy--until the central purposes of the conspiracy have either failed or been achieved.

6. ____. The federal courts and the overwhelming majority of state courts reject any argument that postcrime concealment is implicitly encompassed by the underlying conspiracy.

7. **Conspiracy: Hearsay: Rules of Evidence.** Absent an express original agreement among the conspirators to continue to act in concert in order to cover up or an independent coverup conspiracy, assertions are not excluded from the hearsay rule when made after the central aim of the conspiracy has ended and while the conspirators were acting in concert to conceal their prior criminal activity.

8. **Conspiracy: Hearsay: Time.** Every conspiracy is by its very nature secret and extending the conspiracy into the concealment phase by virtue merely of acts of covering up, even though done in the context of a mutually understood need for secrecy, would extend the life of a conspiracy indefinitely and concurrently extend indefinitely the time within which hearsay declarations will bind coconspirators.

9. **Conspiracy: Hearsay: Evidence.** To exclude statements from the hearsay prohibition under the theory that the declarant and the defendant formed a separate coverup conspiracy, the preponderance of the evidence must establish the separate conspiracy to conceal without relying on the facts of the original conspiracy to commit the underlying crime and without relying entirely on the hearsay statements themselves.

10. **Conspiracy.** A separate conspiracy to conceal cannot be implied from elements which will be present in virtually every conspiracy case, that is, secrecy plus overt acts of concealment after the main objective has succeeded or failed.

11. **Conspiracy: Rules of Evidence: Case Disapproved.** *State v. Gutierrez*, 272 Neb. 995, 726 N.W.2d 542 (2007), is disapproved insofar as it implies it is "well established" that statements made by a coconspirator in furtherance of avoiding capture or punishment fall under the coconspirator exclusion when the coconspirator is simply attempting to avoid arrest, which is the inevitable course of action following the success or failure of the principal aims of any conspiracy.

12. **Conspiracy.** A conspirator recounting past transactions or events having no connection with what is being done in promotion of the common design cannot be assumed to represent those conspirators associated with him or her. Such narrative statements are likely to be unreliable and self-serving, because they result from premeditation and design.

13. ____. Where a conspirator is not seeking through his or her statements to induce a listener to join the conspiracy, then the listener's subsequent role in the conspiracy does not retroactively convert the statements into declarations in furtherance of the conspiracy.

14. ____. Statements that further a speaker's own individual objective rather than the objective of a conspiracy are not made in furtherance of the conspiracy.

15. **Trial: Hearsay.** Alternate theories of admissibility for a statement objected to as hearsay and admitted for the truth of the matter asserted are limited to theories under which the statement would be admissible for the truth of the matter asserted.

16. **Trial: Evidence: Appeal and Error.** The proponent of evidence who fails to present at trial alternative grounds for the admissibility of the evidence does so at his or her peril. If the record was inadequately developed to support foundation for alternate grounds or the opponent was not fairly given the opportunity to develop facts contrary to admissibility on the alternate grounds, then an appellate court will not affirm the ultimate correctness of the trial court's admission of the evidence under theories presented by the proponent for the first time on appeal.

17. **Rules of Evidence: Hearsay.** Excited utterances are an exception to the hearsay rule, because the spontaneity of excited utterances reduces the risk of inaccuracies inasmuch as the statements are not the result of a declarant's conscious effort to make them.

18. ____: ____. The justification for the excited utterance exception is that circumstances may produce a condition of excitement which temporarily stills the capacity for reflection and produces utterances free of conscious fabrication.

19. **Trial: Witnesses: Appeal and Error.** It would be inappropriate to attempt to ascertain the declarant's unavailability for the first time on appeal without evidence that the declarant was subpoenaed, that an actual claim of privilege was made, or that there was a ruling by the judge on the claimed privilege.

20. **Confessions.** While a self-inculpatory statement is more reliable under the theory that reasonable people do not make self-inculpatory statements unless they believe them to be true, the same cannot be said of a non-self-exculpatory statement.

21. **Confessions: Presumptions.** Statements of accomplices incriminating a defendant have traditionally been viewed with special suspicion and considered presumptively unreliable.

22. **Confessions.** Whether a particular remark within a larger narrative is "truly self-inculpatory"--such that a reasonable person would make the statement only if believed to be true--is a fact-intensive inquiry requiring careful examination of all the circumstances surrounding the criminal activity involved.

23. ____. A statement that is in part inculpatory by admitting some complicity, but that is exculpatory insofar as it places the major responsibility on others, does not meet the test of trustworthiness and is thus inadmissible.

24. **Criminal Law: Trial: Evidence: Appeal and Error.** In a jury trial of a criminal case, an erroneous evidential ruling results in prejudice to a defendant unless the State demonstrates that the error was harmless beyond a reasonable doubt.

25. **Verdicts: Juries: Appeal and Error.** In a harmless error review, an appellate court looks at the evidence upon which the jury rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather, whether the guilty verdict rendered in the trial was surely unattributable to the error.

26. **Verdicts: Evidence: Appeal and Error.** Overwhelming evidence of guilt can be considered in determining whether the verdict rendered was surely unattributable to the error, but overwhelming evidence of guilt is not alone sufficient to find the erroneous admission of evidence harmless.

27. **Convictions: Evidence.** Where evidence is cumulative and other competent evidence supports the conviction, improper admission or exclusion of evidence may be harmless.

28. **Double Jeopardy: Evidence: New Trial: Appeal and Error.** The Double Jeopardy Clause does not forbid a retrial so long as the sum of all the evidence admitted by a trial court, whether erroneously or not, would have been sufficient to sustain a guilty verdict.

WRIGHT, CONNOLLY, MCCORMACK, MILLER-LERMAN, and CASSEL, JJ., and IRWIN and BISHOP, Judges.

WRIGHT, J.

## I. NATURE OF CASE

Timothy J. Britt was convicted on three counts of first degree murder, three counts of use of a deadly weapon to commit a felony, and one count of possession of a deadly weapon by a prohibited person. These convictions were based in part upon the testimony of several witnesses as to statements made by an alleged coconspirator, Anthony Davis, after the murders. Britt appeals, arguing that the trial court erred in overruling his hearsay objections to these statements.

## II. BACKGROUND

Britt's convictions arose out of the deaths of Miguel E. Avalos, Sr. (Miguel Sr.); Jose Avalos; and Miguel E. Avalos, Jr. (Miguel Jr.) Davis was convicted in a separate trial of three counts of first degree murder and three counts of use of a deadly weapon to commit a felony arising from the deaths of the same victims.[1] At the time of Britt's trial, Davis was awaiting sentencing.

### 1. ATTEMPTED ROBBERY

In the early morning hours of July 9, 2012, Miguel Sr., Jose, and Miguel Jr. were shot and killed during an attempted robbery of their house near the intersection of Ninth and Bancroft Streets in Omaha, Nebraska. At the time of the robbery, Miguel Sr.'s oldest son was living in the basement of the house with his wife and infant child. This son heard the shots and hid with his family. He testified that he believed he heard more than one intruder.

Miguel Sr. was a known drug dealer. Before Miguel Sr.'s death, a confidential informant, Greg Logemann, told police about Miguel Sr.'s drug dealings. Logemann was also a drug dealer and was friends with Davis. Britt's brother, Mike Britt, was also a friend of Davis.

Logemann testified that in early July 2012, he and Davis began plans to rob Miguel Sr. In exchange for his testimony at trial, Logemann was granted limited use immunity and not charged with the murders. Logemann was charged with criminal conspiracy to commit robbery, a Class II felony.

Logemann stated he thought Miguel Sr. would "be an easy lick." But there was no talk about killing anyone. The plan was that he would show Davis where Miguel Sr. lived and that Davis would then commit the robbery. Davis and Logemann agreed to split the profit from the robbery with "[w]hoever [Davis] took with him" to commit the robbery.

On the evening of July 8, 2012, Davis and Logemann put their plan into action. Davis got a ride from his friend, Crystal Branch, and her roommate, Charice Jones. Both Branch and Jones testified at trial, and both were granted immunity in exchange for their testimony. Branch, who was driving her van, and Jones picked up Davis at his apartment. Britt's brother, Mike, was there, and Branch, Jones, Davis, and Mike left the apartment to pick up Logemann. According to

---

[1] See *State v. Davis*, 290 Neb. 826, 862 N.W.2d 731 (2015).

Jones, they dropped Mike off before picking up Logemann, and Britt joined them in the van at that time.

Logemann testified Britt was in the van when he was picked up. But according to Branch, Mike--not Britt--was with them when they picked up Logemann and drove by the house on Ninth and Bancroft Streets. Logemann's participation in the robbery was to "show [Davis] where to go later on." Logemann, Branch, and Jones testified that, at Logemann's direction, they drove by a house in the area of Ninth and Bancroft Streets, which Logemann identified as Miguel Sr.'s house.

When they drove by Miguel Sr.'s house, Branch and Jones were in the front seats listening to music and drinking beer. Davis, Logemann, and the third person (being either Britt or Mike) sat in one of the back bench seats. Logemann sat near Britt (or Mike) and Davis in the van while Logemann discussed the planned robbery with Davis. Logemann's testimony regarding the specific details of the discussion was unclear.

Logemann, Branch, and Jones testified that Jones drove Logemann back to his apartment. According to Branch, they next dropped off Mike and picked up Britt.

Branch and Jones testified that shortly after dropping off Logemann, Davis and Britt went to the house where Branch and Jones lived. Branch and Jones testified that they all drank alcohol. Jones ingested methamphetamine, and Branch smoked marijuana.

Branch and Jones testified that in the early morning hours of July 9, 2012, Davis asked them to drive him and Britt back to the area of Ninth and Bancroft Streets. Branch and Jones agreed and testified that the van contained only Branch, Jones, Davis, and Britt.

Once at Ninth and Bancroft Streets, Britt asked for the keys to the van and directed Branch and Jones to get in the back seat, which they did. Branch and Jones testified that Davis and Britt then left the van. Branch and Jones sat in the back of the van drinking alcohol and playing on their cell phones. Davis returned after approximately 5 minutes. He silently got into the van and said nothing. About 5 minutes later, Britt returned to the van and drove them back to Branch's house.

Branch testified that Britt ran back to the van, wearing a bandanna over his face and gloves on his hands. Jones stated that she did not notice Britt wearing a bandanna and gloves, and believed that she would have noticed if Britt had been wearing such items upon his return. Jones did not say that Britt ran to the van. No one saw Davis or Britt with a weapon. Upon arrival Britt said, "[D]id you hear anything"?

Logemann testified that Branch and Jones knew about the robbery and, "[a]s far as I know," they were "in on the cut of the action." Branch and Jones stated they believed Davis was going to buy drugs from whoever lived in the house and believed they had driven by the first time because the dealer was not home. Jones thought Britt had asked for her keys before going into the house on Ninth and Bancroft Streets because she had been drinking.

## 2. POLICE INVESTIGATION

During this same general timeframe, officers from the Omaha Police Department received a 911 emergency dispatch call reporting a shooting at the Avalos house. Upon arriving at the house, the officers discovered an older male, later identified as Miguel Sr., and two teenage males, later identified as Jose and Miguel Jr., lying in pools of blood on the floor.

Miguel Sr. was found in the dining room, Jose was in the hallway, and Miguel Jr. was in his bedroom. All three victims had suffered multiple gunshot wounds to the head and/or chest.

It was determined that the shots had been fired by at least two guns--one shooting .22-caliber bullets, and another shooting .40-caliber bullets. Spent shell casings from .40-caliber bullets were found in the living room, dining room, and bedrooms. Jose was pronounced dead at the scene; Miguel Sr. and Miguel Jr. were taken to an Omaha hospital, where they subsequently died from their injuries.

The police confiscated various items from the house, including a .40-caliber semiautomatic handgun, methamphetamine, and over $5,000 in cash. The .40-caliber semiautomatic handgun was found on the floor in Miguel Sr.'s bedroom, which was in disarray. The DNA testing of the semiautomatic handgun was inconclusive as to Davis and Britt. They could neither be included nor excluded as having contributed DNA to the gun. The Avalos house was tested for fingerprints, but the only usable print recovered was that of Miguel Jr.

Logemann initially denied knowing anything about the murders. On July 20, 2012, Logemann told the police about the conspiracy to rob Miguel Sr., and the police thereafter contacted Branch and Jones. Initially, Branch and Jones were untruthful, but eventually reported to the police Davis' and Britt's movements on July 8 and 9.

The police also contacted Tiaotta Clairday, Davis' girlfriend, who provided information about Davis' and Britt's actions in the days following the murders. With Clairday's assistance, the police retrieved a .22-caliber revolver from a culvert near Ashland, Nebraska. Clairday reported that the gun came from Britt. Comparisons of the revolver to the .22-caliber bullets recovered during the autopsies were inconclusive. Logemann stated that before July 8, 2012, he had seen Davis with a .22-caliber revolver in the basement of Davis' apartment.

### 3. PERIOD DURING WHICH DAVIS AND BRITT AVOIDED APPREHENSION

Britt was not apprehended until July 25, 2012. Before his apprehension, Britt stayed at the house where Branch and Jones lived. Branch, Jones, Clairday, and Logemann testified about numerous statements made by Davis following the murders and preceding Britt's arrest. Davis did not testify at trial.

Over Britt's hearsay objection, the trial court admitted Davis' statements as nonhearsay statements by a coconspirator under Neb. Rev. Stat. § 27-801(4)(b)(v) (Reissue 2008). The court apparently relied on *State v. Gutierrez*[2] for the proposition that the conspiracy does continue during the period of concealment after the principal aims of a conspiracy. The court did not find that Davis and Britt had formed a new coverup conspiracy.

#### (a) Branch

Branch testified that at approximately 4 a.m., she, Jones, Davis, and Britt arrived back at the house she shared with Jones. She witnessed Davis and Britt having an argument half a block from the house and before Davis and Britt came inside.

---

[2] *State v. Gutierrez*, 272 Neb. 995, 726 N.W.2d 542 (2007), *abrogated on other grounds, State v. Thorpe*, 280 Neb. 11, 783 N.W.2d 749 (2010).

Once in the house, Davis went to the bathroom and appeared to be sick. Britt sat on the couch and was silent. When Davis reemerged from the bathroom, he said he was trying to find a ride to get home. Eventually, Clairday arrived to pick up Davis and Britt, and they left.

A couple of hours later, Branch saw on the news reports of a triple homicide near Ninth and Bancroft Streets. Branch contacted Davis and made arrangements to meet with Davis that afternoon. When Branch, Jones, and Davis met, Davis confiscated Jones' and Branch's cell phones to see who they had been texting.

Branch testified that at that time, Davis told her she "needed to get out of town" and asked how much money she had. When Branch asked Davis what he had gotten himself into, Davis responded that "he had to answer to other people, and he thought [Branch] and [her] kids' safety was in jeopardy"; that "he had to answer to higher-ups now"; that he "just wanted [Branch] and [her] kids out of town"; and that he "would deal with the rest later." Branch understood from the statements that Britt intended to kill her and Jones.

Branch further testified that Davis told her during that meeting that "Britt had brought a gun to the situation, and that that was never supposed to have went down like that." Branch said Davis told them to go home and wait for his telephone call.

Later that evening, Davis and Britt visited Branch and Jones at their home. Davis eventually left, but Britt stayed. He began living in the basement with Jones and her two children until he was arrested. Branch testified that she did not have much contact with Britt when she was in the house, but that Britt went with her and Jones any time they left the house. Branch stated that she was not comfortable with Britt's staying in the house.

### (b) Jones

Jones' testimony concerning the period of time after the murders was similar to Branch's. She said the day after the murders, Davis "asked if we could get out of town" and offered to "help come up with some money," and he told her "it was out of his hands, he was answering to somebody else." Jones admitted that Davis did not specifically mention Britt during that conversation.

A couple of days after the murders, Davis and Britt returned to the house where Branch and Jones lived. Britt spoke privately with Jones, asking her questions about her children, her age, and the children's father, which made Jones feel nervous. Britt began staying with Jones in the basement, sleeping in her bedroom. Jones described Britt as "scary" and stated that she was nervous and scared while he was staying with her.

### (c) Clairday

Clairday testified that when Davis asked her to come pick him up in the early morning hours of July 9, 2012, he seemed upset. He was talking low and fast. Clairday did not wish to pick Davis up, because doing so would violate the curfew that was a condition of her probation. When Clairday insisted Davis tell her what was going on, Davis told her that "something had happened that shouldn't have happened, and that some people got hurt that shouldn't have got hurt." This statement was not objected to, and is the only statement at issue that was made before Britt obtained a standing hearsay objection.

Clairday testified that when she arrived at Branch and Jones' house, Davis told her that "they had went to rob somebody, and some things had happened that weren't supposed to happen" and that "some people got hurt that shouldn't have got hurt." Clairday testified that she and Davis engaged in a heated argument, "mostly because he was at another woman's house."

Davis eventually explained that she had to give Britt a ride also. Davis told Clairday that Britt had a gun. Clairday was not enthusiastic about giving Britt a ride, but she relented. When Britt entered her car, Clairday asked him if he had anything he was not supposed to have. Britt responded by handing her a revolver.

Clairday testified that she drove first to the apartment of her friend, Larry Lautenschlager. The revolver was in her handbag, and Clairday handed it to Lautenschlager and asked him to get rid of it. She asked Lautenschlager for two changes of clothes for Davis and Britt. Clairday denied noticing anything amiss with the clothing either Davis or Britt wore.

Clairday said that while this was occurring, Davis was standing by the door looking at her and "shaking his head, like asking me what I was doing." Then Davis asked to speak with Clairday privately in the bathroom. Clairday testified that in the bathroom, Davis was "rambling." He appeared nervous, scared, and "like he had the shakes." Davis told Clairday that "he wanted [Clairday] to stay by him, he didn't want [her] by [Britt]," and that "something happened." Clairday helped Davis change his clothes. When they exited the bathroom and went outside, Clairday saw Britt burning a pair of gloves on the grill.

Davis, Britt, and Clairday left Lautenschlager's apartment and went to Clairday's apartment. Britt stayed downstairs, while Davis and Clairday went upstairs. Clairday testified that she and Davis spoke about Davis' leaving town. Davis was scared and crying. Clairday "wasn't understanding what he was trying to tell me." At some point during the conversation, Britt called up the stairs and asked Davis "if he was losing him." After packing a bag for Davis, they all left and went to Logemann's apartment.

At Logemann's apartment, Britt and Clairday stayed in the car, while Davis went inside. Clairday testified that she asked Britt what was going on, but Britt did not respond.

Clairday contacted an aunt in California to make arrangements for Davis to stay with her. Davis and Clairday then dropped off Britt. As Clairday's conversation with Davis continued, Clairday testified that "[i]t had started dawning on me what had happened. He was talking, he was just telling me how much he loved me, and if I was going to leave him if he went to jail."

Clairday dropped Davis off at her apartment and went back to Lautenschlager's apartment to consume methamphetamine. Lautenschlager had not yet disposed of the revolver, and she became upset with Lautenschlager and took the revolver back. Clairday returned to her apartment, she showed the gun to Davis, and they argued.

Clairday left and eventually hid the gun in her car. When Clairday returned, she lied to Davis and told him that she had thrown the gun in the river. Clairday then took Davis to a friend's apartment.

After dropping off Davis, Clairday drove to a house in Ashland where she had been living with another man, Eugene Cates. Cates hid the revolver under his bed. A couple of days later, Clairday moved back to the apartment she shared with Davis; she was on probation, and her request to relocate to Ashland was denied. Britt visited the apartment, and Clairday testified that Davis and Britt spoke in "hush tones." Clairday also testified that she once overheard Davis

ask on the telephone "where the other gun was." Clairday did not specifically identify to whom Davis was speaking.

Clairday continued to tell Davis that she had thrown the gun in the river. Then Clairday went with Cates and Lautenschlager and hid the gun in such a manner that neither Cates nor Lautenschlager would know where she had hidden it.

Clairday testified that shortly before Davis was arrested, "we had started talking a little bit about everything." During that time, Davis explained to her that

> they had went to the house to rob somebody, and that when they had gotten there, he was inside of a room going through stuff and he heard gunshots. He ran out into the hall, and [Britt] had met him in the hall. Somebody was coming down the hall and they started shooting.

She also testified that she understood from these conversations that it was Britt, not Davis, who had started shooting first. Clairday testified that Davis said that "[Britt] was trigger happy."

On redirect, Clairday admitted that she had told the police Davis had said that while Davis was searching through one of the rooms of the Avalos house, "[Britt] went pop, pop, pop in the other room." She eventually kicked Davis out of her apartment.

### (d) Logemann

Logemann testified that around 5 a.m. on July 9, 2012, he received a text message from Davis informing him that "they didn't do the robbery because his girlfriend caught him with some other women." Davis texted Logemann later that day stating, again, that nothing had happened.

After Logemann's police contact asked him about the murders, Logemann confronted Davis. Logemann testified that on the afternoon of July 9, 2012, Davis finally explained to him that "everything went wrong" and that "Cuz started shooting."

Logemann explained that he believed "Cuz" was a reference to Britt. But Logemann admitted on cross-examination that he had spoken to the police about a person named "Mike Jones," a man with whom Davis frequently associated and whom people referred to as "Cuz." This "Mike Jones" was apparently not the same Mike who was Britt's brother. Logemann admitted that he did not know whether Britt was the person that Logemann took with him to commit the robbery, because he "wasn't there."

Several days after the murders, Davis and Britt visited Logemann at his apartment. Logemann testified that Britt asked him about pictures of his children on the refrigerator, which made him feel nervous.

At some other point in time after the murders, Davis told Logemann that "he was worried about DNA because a gun got dropped." Logemann admitted that Davis did not specify whose DNA he was worried about or who dropped the gun.

### 4. DEFENSE WITNESS LAUTENSCHLAGER

Britt called only one witness in his defense. Lautenschlager testified that he was friends with Clairday, but he denied that in July 2012, she had given him a gun to hide.

## 5. CLOSING ARGUMENTS

### (a) State

In closing arguments, the State described how Davis and Britt had "used a couple of unwitting girls" who "weren't directly involved" and who likely did not hear any robbery plan discussed in the van due to the loud music. The State argued that Davis and Britt used Branch and Jones to get them to the location of an attempted robbery that "went horribly wrong."

After the State emphasized that a .40-caliber semiautomatic handgun apparently used in the shootings was found at the scene, it referenced Davis' "co-conspirator statement" that he was worried about DNA being found on a gun left at the scene. In the context of discussing the fact that .22-caliber bullets were also used in the shooting, the State pointed out that Britt had given Clairday a .22-caliber revolver. The State described the positions of the bodies and the number of wounds, then the State emphasized various other "co-conspirator statements" made by Davis, including that "Cuz started shooting" and that Davis had heard "pop, pop, pop" when he was in another room.

The State described how the murders had "affected" Davis; he was "freaking out and getting sick." The State described that for Davis, this was a "most dire of times in a situation where you have just been part of what is the worse as he described something that never should have happened."

In that situation, Davis "calls the single most important person that he can think of at the time to try to get away." The State characterized Clairday's demand of the gun as "a prepay" for the "cab" and stated that the scenario described by Clairday was "not anything except what it is described." According to the State, Clairday kept the gun Britt handed her in order to keep it away from him. The State further described Clairday's actions in hiding the gun as "trying to help someone she loved."

While at Clairday's apartment, Britt was "concerned that . . . Davis now is the person that's going to come in and testify because he can't handle it because he's breaking down because of the tragedy and events that those two had performed."

The State described that Britt "coldly and more calculatingly starts thinking for himself." Britt was "tracking Davis from down the stairs." The State clarified that Britt's asking Davis if he was still with him was not "innocent and innocuous words." Rather, "[t]he turn is taking place; . . . the people who were the planner[s] are getting intimidated by this person [Britt] who is just watching and staring."

While Britt was "not talking directly about escape at that point, he does end up in a position with the two girls where he's able to monitor them daily and regularly." The State suggested that Britt deliberately tried to scare, intimidate, and keep an eye on Branch, Jones, and Logemann, because they were the only three people that linked Davis and Britt to the murders.

The State explained that Logemann originally lied to the police because he was worried about being implicated in a robbery. The State noted that Logemann did not even understand the concept of felony murder.

(b) Defense

The defense argued that Branch and Jones were part of the conspiracy to rob Miguel Sr.--not Britt--and that they possibly went into the Avalos house rather than wait in the van. The defense illustrated the contradictions between Branch's and Jones' testimonies, and also the fact that Jones had three unrelated robbery charges pending against her at the time of Britt's trial. The defense pointed out that there was no reason for Logemann to lie about Branch's and Jones' knowledge of the robbery.

The defense suggested that Davis' friend, "Mike Jones," rather than Britt, may have been involved in the attempted robbery and murders. Either way, the defense argued that Branch, Jones, Logemann, and Davis wanted to shift the blame away from themselves and onto Britt.

The defense asserted that Clairday would do whatever it took to protect Davis. The defense argued that it would be unbelievable that Britt would have handed Clairday his gun at her request: "[S]ome lady, stranger just says you got something for me? Yeah, sure, here's the murder weapon, go ahead and hang on to that, I'll put my life in your hands." The defense argued that the gun belonged to Davis and was given to Clairday by Davis. The defense also noted in this regard that Lautenschlager denied that Clairday gave him a gun to get rid of.

The defense pointed out that only Davis appeared concerned with trying to get out of town and with checking whether Branch or Jones had incriminating evidence on their cell phones. The defense suggested that this was because Britt had no reason to hide.

The defense found it "[u]nbelievable" that Britt moved into the house where Branch and Jones lived against their will, noting that they could have called the police at any time. The defense emphasized that there was no physical evidence linking Britt to the crime, despite the fact that several physical items were handled during the attempted robbery.

III. ASSIGNMENT OF ERROR

Britt assigns that the trial court erred by admitting hearsay testimony under the coconspirator exception to the hearsay rule.

IV. STANDARD OF REVIEW

[1] Apart from rulings under the residual hearsay exception, we review for clear error the factual findings underpinning a trial court's hearsay ruling and review de novo the court's ultimate determination to admit evidence over a hearsay objection.[3]

V. ANALYSIS

We are asked to determine whether the trial court erred in admitting Davis' out-of-court statements to Logemann, Branch, Jones, and Clairday in the weeks following the murders. Britt asserts that the trial court erred in failing to grant his hearsay objections to these statements.

The hearsay rule is premised on the theory that out-of-court statements are subject to particular hazards.[4] The declarant could have misperceived events, be lying, or have a faulty

---

[3] *State v. Draganescu*, 276 Neb. 448, 755 N.W.2d 57 (2008).

[4] *Williamson v. United States*, 512 U.S. 594, 114 S. Ct. 2431, 129 L. Ed. 2d 476 (1994).

- 12 -

memory.[5] The declarant's statements could be taken out of context or misunderstood.[6] Because the statements were made out of court, these dangers are not minimized by the oath, the witness' awareness of the gravity of the proceedings, the jury's ability to observe the witness' demeanor, and cross-examination.[7] The exclusions and exceptions to the hearsay rule recognize, however, that some kinds of out-of-court statements are less subject to the particular hazards that the hearsay prohibition protects against.[8]

[2] The State argues that most of Davis' statements were properly admitted under the coconspirator exclusion to the hearsay rule. To the extent the statements do not meet the criteria for the coconspirator exclusion, the State urges this court to affirm their admission under the excited utterance and against interest exceptions to the hearsay rule, which were neither presented to nor determined by the trial court. We have said that regardless of whether the proponent or the trial court articulated no theory or the wrong theory of admissibility, an appellate court may affirm the ultimate correctness of the trial court's admission of the evidence under any theory supported by the record, so long as both parties had a fair opportunity to develop the record and the circumstances otherwise would make it fair to do so.[9]

### 1. COCONSPIRATOR EXCLUSION

[3] We turn first to the coconspirator exclusion. The coconspirator exclusion, found in § 27-801(4), provides that "[a] statement is not hearsay if . . . (b) The statement is offered against a party and is . . . (v) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Under this rule, a statement is excluded as nonhearsay if it is more likely than not that (1) a conspiracy existed, (2) the declarant was a member of the conspiracy, (3) the party against whom the assertion is offered was a member of the conspiracy, (4) the assertion was made during the course of the conspiracy, and (5) the assertion was made in furtherance of the conspiracy.[10]

[4] The underlying theory of the coconspirator exclusion is that because the conspirators are all partners in the commission of the crime, they have a collective responsibility for the acts and declarations of each other directed toward the accomplishment of the common purpose.[11] The declarant conspirator is considered under such circumstances to be the agent of his or her fellow conspirators, and the commonality of interests gives some assurance that the statements are reliable.[12]

---

[5] *Id.*

[6] *Id.*

[7] See *id.*

[8] See *id.*

[9] *State v. Henry*, 292 Neb. 834, 875 N.W.2d 374 (2016).

[10] See David F. Binder, Hearsay Handbook, 4th § 35:9 (2015-16 ed.). See, also, *Bourjaily v. United States*, 483 U.S. 171, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987).

[11] Annot., 4 A.L.R.3d 671, § 2[a] (1965).

[12] See, e.g., *Lutwak v. United States*, 344 U.S. 604, 73 S. Ct. 481, 97 L. Ed. 593 (1953); *State v. Henry, supra* note 9; *Commonwealth v. Bongarzone*, 390 Mass. 326, 455 N.E.2d 1183 (1983).

[5] It is well established that a conspiracy is ongoing--such that statements are considered made during the course of the conspiracy--until the central purposes of the conspiracy have either failed or been achieved.[13] Here, the central purpose of the conspiracy between Davis, Britt, and Logemann was to rob Miguel Sr. All the statements Britt objected to at trial were made after that robbery had failed. There is no evidence that after the robbery failed, Davis, Britt, and Logemann still intended to carry it out.

### (a) Majority Rule

[6,7] The federal courts and the overwhelming majority of state courts reject any argument that postcrime concealment is implicitly encompassed by the underlying conspiracy. The majority rule is that the agreement or understanding that forms the conspiracy does include an implied agreement that the conspirators will try to avoid apprehension after the crime has been committed.[14] Therefore, absent an "express original agreement among the conspirators to continue to act in concert in order to cover up"[15] or an independent "coverup conspiracy,"[16] assertions are not excluded from the hearsay rule when made after the central aim of the conspiracy has ended and while the conspirators were acting in concert to conceal their prior criminal activity.[17]

The U.S. Supreme Court has weighed in on this issue several times, "consistently refus[ing] to broaden that very narrow [coconspirator exclusion] to the traditional hearsay rule"[18] and specifically rejecting any argument that an implicit subsidiary phase of a conspiracy continues after the central objectives have succeeded or failed.[19]

The Court reasons that "acts of covering up can by themselves indicate nothing more than that the conspirators do not wish to be apprehended--a concomitant, certainly, of every crime since Cain attempted to conceal the murder of Abel from the Lord."[20] Furthermore, implying a postcrime concealment phase to conspiracies would unacceptably broaden the limits of the exception:

> It is difficult to see any logical limit to the "implied conspiracy," either as to duration or means, nor does it appear that one could overcome the implication by express

---

[13] See *Krulewitch v. United States*, 336 U.S. 440, 69 S. Ct. 716, 93 L. Ed. 790 (1949).

[14] See, Binder, *supra* note 10, § 35:13 (and cases cited therein); G. Michael Fenner, The Hearsay Rule 84-85 (2013) (and cases cited therein); 4 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 8:60 (4th ed. 2013) (and cases cited therein).

[15] *Grunewald v. United States*, 353 U.S. 391, 404, 77 S. Ct. 963, 1 L. Ed. 2d 931 (1957).

[16] See *U.S. v. DiDomenico*, 78 F.3d 294, 303-04 (7th Cir. 1996).

[17] See, Binder, *supra* note 10, § 35:13 (and cases cited therein); Fenner, *supra* note 14 (and cases cited therein); 4 Mueller & Kirkpatrick, *supra* note 14 (and cases cited therein).

[18] *Wong Sun v. United States*, 371 U.S. 471, 490, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963).

[19] *Id*.; *Grunewald v. United States, supra* note 15; *Lutwak v. United States, supra* note 12; *Krulewitch v. United States, supra* note 13.

[20] *Grunewald v. United States, supra* note 15, 353 U.S. at 405-06.

and credible evidence that no such understanding existed, nor any way in which an accused against whom the presumption is once raised can terminate the imputed agency of his associates to incriminate him. Conspirators, long after the contemplated offense is complete, after perhaps they have fallen out and become enemies, may still incriminate each other by deliberately harmful, but unsworn declarations, or unintentionally by casual conversations out of court.[21]

[8] In *Grunewald v. United States*,[22] the Court summarized that the "crucial teaching" of its case law was that

> after the central criminal purposes of a conspiracy have been attained, a subsidiary conspiracy to conceal may not be implied from circumstantial evidence showing merely that the conspiracy was kept a secret and that the conspirators took care to cover up their crime in order to escape detection and punishment.

"[E]very conspiracy is by its very nature secret" and extending the conspiracy into the concealment phase by virtue merely of "[a]cts of covering up, even though done in the context of a mutually understood need for secrecy," "would extend the life of a conspiracy indefinitely" and concurrently "extend indefinitely the time within which hearsay declarations will bind co-conspirators."[23]

### (b) Davis' Statements Inadmissible Under Majority Rule

The State all but concedes that under this majority rule, none of Davis' statements would be admissible under the coconspirator exclusion to the hearsay rule. The record demonstrates that the events following the murders were not part of an explicit escape or concealment plan that was formed before the murders. Rather, in the original plan, it was presumed that Miguel Sr., being a drug dealer, would never report the robbery. A conspiracy to commit a series of objectives as part of an ongoing operation does not end until the entire sequence of planned aims have failed or been achieved,[24] and a conspiracy to commit a robbery continues until the illegally obtained cash has been divided among the conspirators.[25] But there were no proceeds to be distributed at the time Davis' statements were made, and there was no evidence that the original conspiracy contemplated a series of crimes in which the attempted robbery was but one part.

---

[21] *Krulewitch v. United States, supra* note 13, 336 U.S. at 456 (Jackson, J., concurring; Frankfurter and Murphy, JJ., join).

[22] *Grunewald v. United States, supra* note 15, 353 U.S. at 401-02.

[23] *Id.*, 353 U.S. at 402.

[24] See, *U.S. v. Moses*, 148 F.3d 277 (3d Cir. 1998); *U.S. v. DiDomenico, supra* note 16; *United States v. Del Valle*, 587 F.2d 699 (5th Cir. 1979).

[25] See, *U.S. v. Franklin*, 415 F.3d 537 (6th Cir. 2005); *United States v. Davis*, 766 F.2d 1452 (10th Cir. 1985); *United States v. Hickey*, 596 F.2d 1082 (1st Cir. 1979); *United States v. Knuckles*, 581 F.2d 305 (2d Cir. 1978).

(c) Coverup Conspiracy

[9] The State instead argues that there was sufficient evidence of an independent coverup conspiracy. To exclude statements from the hearsay prohibition under such a theory, the preponderance of the evidence must establish the separate conspiracy to conceal without relying on the facts of the original conspiracy to commit the underlying crime[26] and without relying entirely on the hearsay statements themselves.[27]

[10] A separate conspiracy to conceal cannot be implied from elements which will be present in virtually every conspiracy case, that is, secrecy plus overt acts of concealment after the main objective has succeeded or failed.[28] There must instead be direct evidence showing an agreement among the conspirators to continue to act in concert in order to cover up the crimes, in addition to an overt act.[29] The essence of the crime of conspiracy is the agreement.[30] Both Davis (the declarant) and Britt (the party against whom the statement is offered) must have agreed to be members of this alleged second coverup conspiracy.

Leaving aside the fact that an independent coverup conspiracy was never found below, the record does not support such a conspiracy. There was little evidence of an agreement or understanding between any of the original conspirators after the murders. The record indicates to the contrary that the original conspirators, particularly Davis and Britt, had ceased thinking or acting in concert. After the murders, Davis immediately lied to Logemann, saying that they did not attempt to carry out the robbery. Davis then urged Branch and Jones to get away from Britt, acting contrary to Britt's apparent plan to either kill or shadow Branch and Jones in order to ensure their silence. Davis made plans to escape to California that did not include Britt. Britt worried that he was "losing" Davis. Even the State described Britt during this period as "thinking for himself." The preponderance of the evidence does not establish that Davis and Britt conspired to cover up the murders.

---

[26] See, Fenner, *supra* note 14; *Lutwak v. United States, supra* note 12; *Krulewitch v. United States, supra* note 13; *Villafranca v. People*, 194 Colo. 472, 573 P.2d 540 (1978); *Wells v. State*, 492 So. 2d 712 (Fla. App. 1986).

[27] See *State v. Myers*, 258 Neb. 300, 603 N.W.2d 378 (1999). See, also, *Bourjaily v. United States, supra* note 10.

[28] See *Grunewald v. United States, supra* note 15.

[29] See *id.*

[30] See *Braverman v. United States*, 317 U.S. 49, 63 S. Ct. 99, 87 L. Ed. 23 (1942).

## (d) Minority View

Alternative to its coverup conspiracy argument, the State urges us to adopt the minority view that allows an implied concealment phase to be considered a continuation of the underlying conspiracy. This position is recognized by only a small minority of state courts.[31]

### *(i)* State v. Gutierrez

We acknowledge that in *State v. Gutierrez*,[32] we said it is well established that statements made by a coconspirator in furtherance of avoiding capture or punishment are made in furtherance of the conspiracy within the meaning of § 27-801. It is unclear what we meant by this broadly worded proposition. But we did not adopt in *Gutierrez* the minority view that implicit plans of postcrime concealment constitute a continuation of the original conspiracy.

When we made this statement in *Gutierrez*, we had already held that the defendant's general hearsay objection was insufficient to preserve the issue of whether the statements fell under the coconspirator exclusion.[33] Furthermore, we did not specifically discuss in *Gutierrez* whether, at the time that the relevant statements were made, the conspiracy was ongoing such that the statements were made in the course of the conspiracy. The issue discussed was whether the statements were in furtherance of the conspiracy.

*Gutierrez* is readily distinguishable, because the statements in *Gutierrez* were the defendant's statements, telling a fellow drug dealer that the defendant's drug business associate had been involved in a murder and asking for shelter and advice. This was, however, complicated by the fact that the coconspirators were tried together. A codefendant objected to statements made by the defendant to a participant in a marijuana distribution operation in the participant's apartment while seeking refuge from the police and to a friend of the codefendant while both were in jail. The defendant asked the friend why he had "told" on the defendant. We concluded that the statement made in jail did not implicate the codefendant in any way and that its admission was at worst harmless error. The statement was clearly admissible as to the defendant, and the codefendant did not request a limiting instruction. Those statements were admissible as statements by a party opponent.[34] Furthermore, as statements of the defendant, the statements did not raise the concern articulated by the U.S. Supreme Court that conspirators would be able to incriminate each other by deliberately harmful, but unsworn declarations, or

---

[31] See, *Reed v. People*, 156 Colo. 450, 402 P.2d 68 (1965); *State v. Camacho*, 282 Conn. 328, 924 A.2d 99 (2007); *People v. Meagher*, 70 Ill. App. 3d 597, 388 N.E.2d 801, 26 Ill. Dec. 800 (1979); *State v. Kidd*, 239 N.W.2d 860 (Iowa 1976); *State v. Moody*, 35 Kan. App. 2d 547, 132 P.3d 985 (2006); *Com. v. Bright*, 463 Mass. 421, 974 N.E.2d 1092 (2012); *Com. v. Cull*, 540 Pa. 161, 656 A.2d 476 (1995); *State v. Helmick*, 201 W. Va. 163, 495 S.E.2d 262 (1997). See, also, Binder, *supra* note 10, § 35:13 (and cases cited therein); Fenner, *supra* note 14 (and cases cited therein); 4 Mueller & Kirkpatrick, *supra* note 14 (and cases cited therein).

[32] *State v. Gutierrez, supra* note 2.

[33] *Id.*

[34] See, e.g., *State v. Henry, supra* note 9.

unintentionally by casual conversations out of court, after the contemplated offense is complete.[35]

We cited three cases in support of the proposition that statements made by a coconspirator in furtherance of avoiding capture or punishment are made in furtherance of the conspiracy within the meaning of § 27-801.[36]

In the first case, *U.S. v. Triplett*,[37] the court found admissible statements of the defendant made while in jail, threatening to kill a coconspirator if she testified against the defendant. With no discussion of whether the statements were during the course of an ongoing conspiracy, the court concluded these statements were in furtherance of avoiding punishment and, therefore, in furtherance of the conspiracy.[38] But the statements were made by a party opponent.

In the second case, *U.S. v. Garcia*,[39] a conspiracy to pass counterfeit money was still ongoing at the time of the statements at issue and the only question was whether the statements were in furtherance of that ongoing conspiracy. The court held that statements designed to enlist the listener's assistance by preventing the listener from unintentionally revealing the existence of the conspiracy were not merely narratives informing the listener of the counterfeit activities.[40] The court concluded that other statements to a security guard made by the defendant's son when confronted with the counterfeit money were designed to delay or prevent arrest and thus to allow the conspiracy to continue, and were, accordingly, also in furtherance of the ongoing conspiracy.[41]

In the third case, *United States v. Sears*,[42] the statements were made after a robbery and while the defendant and his coconspirators were at a friend's house for the purposes of showering, changing clothes, counting the proceeds of the robbery, and disposing of their disguises. The stop was planned in advance of the robbery, although the robbers did not expect the friend and owner of the house to be home. When the robbers discovered that the owner was home, the defendant told the friend about the robbery in order to induce the friend into allowing them to use her home to further their escape and also in order to dissuade her from informing the police about the robbery. The court held that these statements were in furtherance of the conspiracy. The court did not explicitly discuss whether the conspiracy was still ongoing at the time the statements were made.

We were correct in *Gutierrez* inasmuch as a statement made in furtherance of avoiding capture or punishment is made in furtherance of the conspiracy when the conspiracy is ongoing

---

[35] See, *Wong Sun v. United States, supra* note 18; *Grunewald v. United States, supra* note 15; *Krulewitch v. United States, supra* note 13.

[36] See *State v. Gutierrez, supra* note 2.

[37] *U.S. v. Triplett*, 922 F.2d 1174 (5th Cir. 1991).

[38] *Id.*

[39] *U.S. v. Garcia*, 893 F.2d 188 (8th Cir. 1990).

[40] See *id.*

[41] *Id.*

[42] *United States v. Sears*, 663 F.2d 896 (9th Cir. 1981).

at the time of the statement; i.e., if the central criminal object or objects that the conspirators conspired to achieve are still being pursued. In both *Garcia* and *Sears*, the originally planned conspiracy was still ongoing at the time the statements were made, either because the original conspiracy was to commit a series of objectives or because the proceeds of the robbery had not yet been divided.[43] Also, in *Sears*, the coverup was agreed upon as a part of the original plans for the conspiracy.[44]

[11] But we disapprove of our statement in *Gutierrez* insofar as we implied it is "well established" that statements made by a coconspirator in furtherance of avoiding capture or punishment fall under the coconspirator exclusion when the coconspirator is simply attempting to avoid arrest, which is the inevitable course of action following the success or failure of the principal aims of any conspiracy.[45] *Triplett* is the only case of the three cited in *Gutierrez* that involved statements after the originally agreed-upon conspiracy ended, and it is seen as an anomaly.[46] And, like in *Gutierrez*, the statements at issue in *Triplett* were made by the defendant and not by a coconspirator. Therefore, the statements were admissible as statements by a party opponent and they did not raise the reliability concerns present for statements by coconspirators after the success or failure of the principal criminal purpose.

### (ii) We Follow Federal Case Law for Similar Rules

We decline the State's invitation to follow the minority rule in this case. We normally take guidance from federal cases interpreting a federal rule with language similar to a Nebraska rule.[47] We see no reason to depart from our existing procedure to deny admission of coconspirators' statements after the object of the conspiracy has ended. In fact, our legislative history indicates a specific intent to have uniformity between our state and the federal rules of evidence--particularly with regard to "'the position of the Supreme Court in denying admissibility to statements made after the objective of the conspiracy have either failed or been achieved.'"[48]

Moreover, we are persuaded by the U.S. Supreme Court's reasoning that the necessary commonality of interests between conspirators is no longer present when the central purpose of the conspiracy has succeeded or failed. Thus, statements made after the central purpose of the conspiracy have succeeded or failed lack the reliability that justifies the exclusion. And we agree with the concern that implicitly extending conspiracies into a concealment phase sets no logical limit on the duration or the means of former conspirators' incrimination of one another through out-of-court statements.

---

[43] See, *U.S. v. Moses, supra* note 24; *U.S. v. DiDomenico, supra* note 16; *United States v. Del Valle, supra* note 24.

[44] See *Grunewald v. United States, supra* note 15.

[45] See *State v. Gutierrez, supra* note 2, 272 Neb. at 1021, 726 N.W.2d at 567.

[46] See Binder, *supra* note 10, § 35:13.

[47] See *State v. Morris*, 251 Neb. 23, 554 N.W.2d 627 (1996).

[48] Neb. Supreme Ct. Comm. on Practice & Procedure, Proposed Nebraska Rules of Evidence, rule 801 at 132 (1973).

### (iii) Davis' Statements Inadmissible Even Under Minority Rule

Even if we were to consider adopting some variation of the minority's implied concealment phase, Davis' statements would not qualify as being in the course and furtherance of any concealment phase of this conspiracy.

Courts that recognize an implied continuing conspiracy to conceal appear to view the component elements of the coconspirator exclusion more narrowly once the agreed-upon crime has been committed, and they add temporal limits to the concealment period.[49] These minority courts are presumably attempting to cordon the slippery slope of infinite time and means for conspirators to incriminate each other through out-of-court statements.[50]

Thus, under the minority view that recognizes an implied concealment phase, the conspirators must actually be acting in concert at the time of the coverup in order for the conspiracy to be continuing.[51] The presumption that the conspiracy continues as to all its members until affirmative withdrawal[52] apparently no longer applies.

Also, for a statement made in the concealment phase to be admissible, it must be in furtherance of concealment.[53] The statement must specifically continue the aims of concealing the conspiracy, such as eluding detection for, disposing of, or protecting the fruits of the crime.[54]

[12] Finally, as under the majority rule, a conspirator recounting past transactions or events having no connection with what is being done in promotion of the common design cannot be assumed to represent those conspirators associated with him or her.[55] Such narrative statements are likely to be unreliable and self-serving, because they result from premeditation and design.[56] This is especially true for statements that attempt to shift blame after the central purpose of the conspiracy has succeeded or failed.[57]

We have already discussed that in the period after the murders, there was a notable lack of concert of action and meeting of the minds. The State described Britt as coldly and calculatingly "thinking for himself," while Davis was "breaking down" because of the "tragedy" that had occurred. Davis' out-of-court statements were all outside of Britt's presence and contrary to Britt's desired strategy of concealment. In fact, Davis repeatedly urged Branch,

---

[49] See, *Krulewitch v. United States, supra* note 13 (and discussion therein); *Mares v. United States*, 383 F.2d 805 (10th Cir. 1967); *State v. Kidd, supra* note 31; *State v. Rivenbark*, 311 Md. 147, 533 A.2d 271 (1987) (and discussion therein).

[50] See, *Grunewald v. United States, supra* note 15; *Krulewitch v. United States, supra* note 13 (Jackson, J., concurring; Frankfurter and Murphy, JJ., join).

[51] See, *Mares v. United States, supra* note 49; *State v. Kidd, supra* note 31.

[52] See *State v. Henry, supra* note 9.

[53] *State v. Cornell*, 314 Or. 673, 842 P.2d 394 (1992); *State v. Helmick, supra* note 31.

[54] *Id.*

[55] *State v. Gilmore*, 151 Iowa 618, 132 N.W. 53 (1911).

[56] *State v. Warren*, 242 Iowa 1176, 47 N.W.2d 221 (1951).

[57] See, *U.S. v. Blakey*, 960 F.2d 996 (11th Cir. 1992); 4 A.L.R.3d, *supra* note 11, § 3 (and cases cited therein).

Jones, and Clairday to get away from Britt's reach. During this time, Britt expressed concerns about whether Britt was "losing him."

Many of Davis' statements, moreover, were mere narratives of the crime. While some such statements could have been deemed in furtherance of the conspiracy had they been made during the traditional phase of the conspiracy,[58] they warrant special scrutiny in an alleged, implied concealment phase. The fact that all of the narrative statements made by Davis shifted blame to Britt for the murders is antithetical to a finding that they were in furtherance of an ongoing conspiracy between Davis and Britt. These statements were more in keeping with the "'reality of the criminal process . . . that once partners in a crime recognize that the "jig is up," they tend to lose any identity of interest and immediately become antagonists, rather than accomplices.'"[59]

[13] Davis' revelations of the crimes to Branch, Jones, and Clairday did not further the aims of concealment insofar as Davis revealed incriminating information that those women would not have otherwise known.[60] While the State asserts on appeal that Branch and Jones were coconspirators, this position is directly contrary to the position the State took at trial, describing Branch and Jones as "a couple of unwitting girls." The State also points out that Clairday provided some assistance to Davis by concealing the gun Britt gave to her and that Branch and Jones may have been intimidated into silence by Davis' warnings to get away from Britt. But it does not appear that Davis' statements were for those purposes. Where a conspirator is not seeking through his or her statements to induce a listener to join the conspiracy, then the listener's subsequent role in the conspiracy does not retroactively convert the statements into declarations in furtherance of the conspiracy.[61]

[14] Whatever occurred as a result of Davis' statements, the statements appeared, from the testimony and under the State's theory of the case, to be in furtherance of Davis' concern for the women he was speaking to and Davis' individually serving narrative that he was not morally culpable for the victims' deaths. Statements that further a speaker's own individual objective rather than the objective of a conspiracy are not made in furtherance of the conspiracy.[62]

Thus, even under the minority rule, it would be difficult to conclude that a concealment phase of the underlying conspiracy was ongoing at the time of Davis' statements. And even if such an ongoing concealment phase existed, Davis' statements would not be in furtherance of it.

### (e) Conclusion

We find the majority rule persuasive. In any event, this is not an appropriate case to consider straying from the majority rule. We reject the State's suggestion that there was enough

---

[58] See, e.g., *U.S. v. Phillips*, 219 F.3d 404 (5th Cir. 2000); *U.S. v. Monus*, 128 F.3d 376 (6th Cir. 1997); *U.S. v. Simmons*, 923 F.2d 934 (2d Cir. 1991); *United States v. Ammar*, 714 F.2d 238 (3d Cir. 1983). See, also, Fenner, *supra* note 14, pp. 82-83.

[59] *Miller v. Miller*, 784 F. Supp. 390, 395 (E.D. Mich. 1992).

[60] See *State v. Helmick, supra* note 31.

[61] See *U.S. v. Fielding*, 645 F.2d 719 (9th Cir. 1981).

[62] *U.S. v. Salgado*, 250 F.3d 438 (6th Cir. 2001).

evidence to find an independent coverup conspiracy. Therefore, we hold that the trial court erred in admitting Davis' statements under § 27-801(4)(b)(v).

## 2. ALTERNATIVE GROUNDS FOR ULTIMATE CORRECTNESS OF ADMISSION OF EVIDENCE

The State points out that we may affirm the ultimate correctness of the trial court's admission of the evidence under any theory supported by the record so long as both parties had a fair opportunity to develop the record and the circumstances otherwise would make it fair to do so.[63] The State thus urges us to affirm the admission of Davis' statements under alternate hearsay exceptions not presented below.

[15,16] Having obtained a favorable ruling on the admission of the evidence under the coconspirator exclusion, the State did not waive alternate theories of admissibility by failing to raise them below.[64] Nevertheless, alternate theories of admissibility for a statement objected to as hearsay and admitted for the truth of the matter asserted are limited to theories under which the statement would be admissible for the truth of the matter asserted.[65] And the proponent of evidence who fails to present at trial alternative grounds for the admissibility of the evidence does so at his or her peril. If the record was inadequately developed to support foundation for alternate grounds or the opponent was not fairly given the opportunity to develop facts contrary to admissibility on the alternate grounds, then an appellate court will not affirm the ultimate correctness of the trial court's admission of the evidence under theories presented by the proponent for the first time on appeal.[66]

### (a) Excited Utterances

[17,18] The State's first proposed alternate theory is that Davis' statements made to Clairday within 24 hours of the shootings were excited utterances. Excited utterances are an exception to the hearsay rule, because the spontaneity of excited utterances reduces the risk of inaccuracies inasmuch as the statements are not the result of a declarant's conscious effort to make them.[67] The justification for the excited utterance exception is that circumstances may produce a condition of excitement which temporarily stills the capacity for reflection and produces utterances free of conscious fabrication.[68]

For a statement to be an excited utterance, the following criteria must be met: (1) There must be a startling event; (2) the statement must relate to the event; and (3) the declarant must make the statement while under the stress of the event. The true test is not when the exclamation

---

[63] See, *U.S. v. Paulino*, 13 F.3d 20 (1st Cir. 1994); *U.S. v. Williams*, 837 F.2d 1009 (11th Cir. 1988); *United States v. Rosenstein*, 474 F.2d 705 (2d Cir. 1973); *State v. Henry, supra* note 9; *State v. Draganescu, supra* note 3.

[64] See *State v. Henry, supra* note 9.

[65] See, *United States v. Rosenstein, supra* note 63; *State v. Henry, supra* note 9.

[66] See *State v. Henry, supra* note 9.

[67] See *State v. Hughes*, 244 Neb. 810, 510 N.W.2d 33 (1993).

[68] See *State v. Hale*, 290 Neb. 70, 858 N.W.2d 543 (2015).

was made, but whether, under all the circumstances, the declarant was still speaking under the stress of nervous excitement and shock caused by the event.[69] Excited utterances are one of many enumerated exceptions to the hearsay rule for which the unavailability of the declarant is immaterial.[70]

The only statements at issue under this alternate theory are the statements that "they had went to rob somebody, and some things had happened that weren't supposed to happen"; that "some people got hurt that shouldn't have got hurt"; that Davis "wanted [Clairday] to stay by him, he didn't want [her] by [Britt]"; and that "something happened." We find that the record does not demonstrate Davis made these statements while under a condition of excitement that temporarily stilled his capacity for reflection and produced utterances free of conscious fabrication.[71]

The first statement was made when Clairday picked Davis up from the house where Branch and Jones lived. There was little testimony regarding Davis' emotional state other than that he had spoken rapidly earlier on the telephone. The testimony indicates that Davis and Clairday were engaged in an argument around the time of the statement, mostly about the fact that Davis was at another woman's apartment. There is little indication that Davis was speaking with spontaneity and under the stress of nervous excitement and shock.

The remaining statements were made at Lautenschlager's apartment after Davis observed Clairday speaking with Lautenschlager about getting rid of the gun that Britt handed her. Clairday described that Davis was standing by the door, "shaking his head, like asking me what I was doing." Davis then asked Clairday to step into the bathroom with him in order to speak privately, which is when the statements were made. The fact that Davis asked to speak with Clairday privately, as well as the statements themselves, indicate Davis' conscious reflection.

While Clairday testified that Davis appeared nervous, scared, and "like he had the shakes" when he made these statements at Lautenschlager's apartment, manifestations of stress and physical condition are not dispositive.[72] Besides, it would be unfair to rely too heavily upon testimony concerning Davis' physical manifestations of stress when Britt was not on notice at trial that an excited utterance exception was being litigated. The witnesses could have been questioned in more depth about Davis' mental state and his physical manifestations of distress, and we cannot speculate as to what additional testimony would have been adduced.

### (b) Statements Against Interest

The State also argues that the admissibility of Davis' statements should be affirmed on the alternate theory that they were statements against interest. Though the State's argument is not entirely clear, it appears the State believes this exception applicable to all of Davis' statement.

Neb. Rev. Stat. § 27-804(2)(c) (Reissue 2008), provides that if the declarant is unavailable as a witness, the following is not excluded by the hearsay rule: "A statement which

---

[69] *Id.*

[70] See Neb. Rev. Stat. § 27-803 (Reissue 2008).

[71] See *State v. Hale, supra* note 68.

[72] See *id*.

was at the time of its making . . . so far tended to subject [the declarant] to civil or criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true."

Unavailability as a witness is defined by the statute as including situations in which the declarant (1) "[i]s exempted by ruling of the judge on the ground of privilege from testifying concerning the subject matter of his statement," (2) "[p]ersists in refusing to testify concerning the subject matter of his statement despite an order of the judge to do so," (3) "[t]estifies to lack of memory of the subject matter of his statement, (4) "[i]s unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity," or (5) "[i]s absent from the hearing and the proponent of his statement has been unable to procure his attendance by process or other reasonable means."[73]

The against interest exception is "of quite recent vintage" insofar as it encompasses confessions of an accomplice, which incriminate a criminal defendant.[74] Common law admitted statements against the declarant's pecuniary or proprietary interests but refused to extend the exception to statements against penal interests.[75] And before Congress' adoption of Fed. Evid. R. 804(b)(3), the U.S. Supreme Court rejected a penal interests exception.[76] While most courts allow accomplice statements under the against interest exception, the exception is viewed narrowly.[77]

### (i) Unavailability

We turn first to the element of unavailability. Because the State never presented the against interest exception below as a theory of admissibility for Davis' out-of-court statements, the trial court never determined that Davis was unavailable. The State argues that this is not an impediment to affirming the admission of Davis' statements, because a finding that Davis was unavailable was "inevitable."[78] The State describes as "virtually nonexistent" any possibility that Davis would have agreed to testify.[79] Relying on the record in *State v. Davis*,[80] the State notes that Davis' sentencing was pending for his own convictions at the time of Britt's trial. The State also asserts without citation to the record that Davis was not voluntarily cooperating in Britt's prosecution.

The State does not specify under which grounds it would have been "inevitable" that the trial court would have found Davis unavailable, but presumably the State relies on the first

---

[73] § 27-804(1)(a) through (e).

[74] *Lilly v. Virginia*, 527 U.S. 116, 130, 119 S. Ct. 1887, 144 L. Ed. 2d 117 (1999).

[75] See John P. Cronan, *Do Statements Against Interests Exist? A Critique of the Reliability of Federal Rule of Evidence 804(b)(3) and a Proposed Reformulation*, 33 Seton Hall L. Rev. 1 (2002).

[76] *Donnelly v. United States*, 228 U.S. 243, 33 S. Ct. 449, 57 L. Ed. 820 (1913).

[77] See *Williamson v. United States, supra* note 4.

[78] Brief for appellant at 30.

[79] *Id.*

[80] *State v. Davis, supra* note 1.

statutory ground for unavailability: unavailability based on privilege. By referring to the fact that sentencing for Davis' convictions was still pending, the State references the weight of authority that permits a witness whose conviction has not been finalized on direct appeal to invoke the privilege against self-incrimination and to refuse to testify about the subject matter which formed the basis of his conviction.[81]

The State presents no particular authority for its assertion that we can assume for the first time on appeal that the declarant would have been deemed unavailable had the against interest exception been presented below. In other words, the State presents no authority holding that it is fair to affirm the admission of evidence under a hearsay exception for which unavailability must be shown, when the evidence was admitted under an exclusion or an exception for which unavailability is irrelevant.

We have found only one case affirming admission of evidence under the against interest exception that was erroneously admitted under an exception for which unavailability is irrelevant. In that case, unavailability was based on the undisputed evidence that the declarant had been murdered.[82] But in *State v. Stuit*,[83] the Montana Supreme Court found it inappropriate to entertain for the first time on appeal the question of a declarant's unavailability due to lack of memory. And we can find no support for the proposition that it would be appropriate to affirm the correctness of the trial court's admission of hearsay by determining for the first time on appeal that the declarant was unavailable due to a claim of privilege.

In fact, when the lower court has been presented with and has determined such unavailability, it has been held that a trial court cannot rely simply on the State's assurances of unavailability.[84] Nor can the court rely on the declarant's invocation of the privilege against self-incrimination and the failure to call the declarant to testify as a result.[85] Instead, before a declarant may be excused as unavailable based on a claim of privilege, the declarant must appear

---

[81] See, *Mitchell v. United States*, 526 U.S. 314, 119 S. Ct. 1307, 143 L. Ed. 2d 424 (1999); *Ottomano v. United States*, 468 F.2d 269 (1st Cir. 1972); *State v. Gretzler*, 126 Ariz. 60, 612 P.2d 1023 (1980); *People v. Lopez*, 110 Cal. App. 3d 1010, 168 Cal. Rptr. 378 (1980) (superseded by statute as stated in *People v. Gibbs*, 145 Cal. App. 3d 794, 193 Cal. Rptr. 681 (1983)); *People v. Villa*, 671 P.2d 971 (Colo. App. 1983); *Landeverde v. State*, 769 So. 2d 457 (Fla. App. 2000); *Landenberger v. State*, 519 So. 2d 712 (Fla. App. 1988); *State v. Linscott*, 521 A.2d 701 (Me. 1987); *Ellison v. State*, 310 Md. 244, 528 A.2d 1271 (1987); *People v Robertson*, 87 Mich. App. 109, 273 N.W.2d 501 (1978); *State v. Pearsall*, 38 N.C. App. 600, 248 S.E.2d 436 (1978); *State v. Crislip*, 110 N.M. 412, 796 P.2d 1108 (N.M. App. 1990), *overruled on other grounds, Santillanes v. State*, 115 N.M. 215, 849 P.2d 358 (1993); *State v. Sutterfield*, 45 Or. App. 145, 607 P.2d 789 (1980); *Davis v. State*, 501 S.W.2d 629 (Tex. Crim. App. 1973); *State v. Marks*, 194 Wis. 2d 79, 533 N.W.2d 730 (1995).

[82] *U.S. v. Maliszewski*, 161 F.3d 992 (6th Cir. 1998).

[83] *State v. Stuit*, 277 Mont. 227, 921 P.2d 866 (1996).

[84] Fenner, *supra* note 14, pp. 220-23.

[85] *Id*.

at trial, assert the privilege, and have that assertion approved by the trial judge.[86] In addition, the witness must be exempted from testifying by a ruling of the court.[87]

In *United States v. Udey*,[88] the Eighth Circuit Court of Appeals accordingly refused to find error in the exclusion of hearsay purportedly admissible under the against interest exception when there was no claim of privilege, nor a ruling by the court below. The court observed that the definition of unavailability due to privilege plainly requires a "ruling of the court."[89] The court further pointed out that the advisory committee notes to the federal rule strictly state that "'a ruling by the judge is required, which clearly implies that an actual claim of privilege must be made.'"[90]

In *United States v. Fernandez-Roque*,[91] the Fifth Circuit Court of Appeals similarly affirmed the inadmissibility of hearsay because the proponent failed to sustain his burden to show that the declarant was unavailable as a component of the against interest exception. The court noted that the proponent had failed to create a record of his efforts to produce the declarant as a witness, because there was no evidence that the declarant was subpoenaed, or any request of the judge for a ruling on unavailability on account of privilege or for an order to testify.[92]

The court in *Fernandez-Roque* explained that "[t]here was thus no opportunity for the trial court to evaluate [the declarant's] alleged refusal to testify and propensity to invoke the [F]ifth [A]mendment, or to ascertain whether some type of immunity was available to [the declarant] from the effects of his possible incrimination by his testimony."[93] The court refused to speculate on appeal as to the factual merits of the proponent's claim that the declarant was unavailable when the issue of unavailability was never brought into the "ambit of the 'discretion of the trial court to accept or reject counsel's representations' concerning [the declarant's] privilege or refusal to testify."[94]

[19] We hold that it would be inappropriate to attempt to ascertain Davis' unavailability for the first time on appeal, especially under the record before us. There is no evidence that Davis was subpoenaed, that an actual claim of privilege was made, or that there was a ruling by the judge on the claimed privilege. Thus, the record was insufficiently developed for this court to affirm the admission of Davis' statements under an exception that was never presented below. We therefore cannot accept the State's invitation to affirm the alleged correctness of the

---

[86] See, *United States v. Udey*, 748 F.2d 1231 (8th Cir. 1984); *Marshall v. Com.*, 60 S.W.3d 513 (Ky. 2001); Fenner, *supra* note 14, pp. 220-23. Compare *State v. McHenry*, 250 Neb. 614, 550 N.W.2d 364 (1996).

[87] Fenner, *supra* note 14, pp. 220-23.

[88] *United States v. Uday, supra* note 86.

[89] *Id*. at 1243.

[90] *Id.*

[91] *United States v. Fernandez-Roque*, 703 F.2d 808 (5th Cir. 1983).

[92] *Id.*

[93] *Id.* at 813.

[94] *Id*.

admission of Davis' statements under the State's alternate theory that the statements fell under the against interest exception to the hearsay rule.

*(ii) Against Interest*

Even if we were to somehow overlook the absence of the requisite showing of unavailability, we observe that under § 27-804(2)(c) many of Davis' statements did not "so far tend[] to subject [Davis] to civil or criminal liability" that a reasonable person in Davis' position would not have made them lest believing them to be true.

In *State v. Phillips*,[95] we adopted the U.S. Supreme Court's narrow interpretation of "statement" to refer to only the specific declaration or remark incriminating the speaker and not more broadly to the entire narrative portion of the speaker's confession.

[20] In *Williamson v. United States*,[96] the U.S. Supreme Court explained that while a self-inculpatory statement is more reliable under the theory that reasonable people do not make self-inculpatory statements unless they believe them to be true, the same cannot be said of a non-self-exculpatory statement. "One of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature."[97]

[21] The Court has noted further in this context that statements of accomplices incriminating a defendant have traditionally been viewed with special suspicion and considered presumptively unreliable.[98] Such statements are not ordinarily unambiguously adverse to the penal interest of the declarant.[99] As we said in *Phillips*, "while there is no clear motivation to lie about a fact that could expose one to criminal liability, there is clear motivation to lie about something that lessens one's culpability."[100] This motivation exists even if a reasonable person in the accomplice's position would believe that lessening culpability will have only a mitigating effect on sentencing--as opposed to exculpating the accomplice of the underlying crime.[101]

[22,23] Whether a particular remark within a larger narrative is "truly self-inculpatory"--such that a reasonable person would make the statement only if believed to be true--is a fact-intensive inquiry requiring careful examination of all the circumstances surrounding the criminal activity involved.[102] When considering statements of a mixed nature, one court has described the question as being whether the statement has a net exculpatory versus net inculpatory effect.[103] A statement that is in part inculpatory by admitting some complicity,

---

[95] *State v. Phillips*, 286 Neb. 974, 840 N.W.2d 500 (2013).

[96] *Williamson v. United States, supra* note 4.

[97] *Id.*, 512 U.S. at 599-600.

[98] *Lilly v. Virginia, supra* note 74.

[99] See *id.*

[100] *State v. Phillips, supra* note 95, 286 Neb. at 993, 840 N.W.2d at 517.

[101] *Williamson v. United States, supra* note 4.

[102] *Id.*, 512 U.S. at 604.

[103] See *People v. Duarte*, 24 Cal. 4th 603, 12 P.3d 1110 (2000). See, also, e.g., *United States v. Lilley*, 581 F.2d 182 (8th Cir. 1978).

but that is exculpatory insofar as it places the major responsibility on others, does not meet the test of trustworthiness and is thus inadmissible.[104]

We find that Davis' statements to Branch that she and her children were in jeopardy, to Clairday that he did not want her by Britt and wanted her to stay by him, and to Jones that it was out of his hands, were not self-inculpatory at all. These statements implicated Britt as dangerous and as having criminal intentions with regard to Branch, Jones, and Clairday, but did not subject Davis to criminal liability.

We find that Davis' statements to Branch that "Britt had brought a gun to the situation, and that that was never supposed to have went down like that"; to Logemann that "everything went wrong" because "Cuz started shooting"; and to Jones that "some things had happened that weren't supposed to happen," that "some people got hurt that shouldn't have got hurt," that "[Britt] was trigger happy," and that "[Britt] went pop, pop, pop in the other room" were attempts to shift blame to Britt. These statements, while partially inculpatory in the sense that they revealed Davis participated in a plan to rob Miguel Sr., are not sufficiently against Davis' penal interests that a reasonable person in Davis' position would not have made them unless believing they were true.

These statements were not directly designed to curry favor with the authorities insofar as they were made to acquaintances, but they had a net exculpatory effect such that they were not "truly self-inculpatory."[105] Through these statements, Davis shifted blame to Britt for the fact that a robbery turned into a triple homicide. Particularly with regard to the statements made to Logemann, a reasonable person in Davis' position could be motivated to lie and shift the blame to Britt as the person responsible for the "easy lick" going awry, causing complications that were never part of the original plan. Davis also appeared generally less culpable through these statements to Branch, Jones, and Clairday, possibly in an attempt to garner their sympathy. And even if we assume a reasonable person in Davis' position would be familiar with the concept of felony murder, such person would believe that if any of these statements shifting blame were reported to the authorities, he would have a greater chance of striking a plea bargain and of receiving a lesser punishment for his crimes.

We need not examine the incriminating nature of the remainder of Davis' statements that were entered into evidence at trial over Britt's hearsay objection. At least some, such as Davis' statements to Clairday that "they" went to the house to rob somebody and that "they started shooting," appear sufficiently self-inculpatory to qualify under the against interest exception. But the very statements the State relied upon most heavily at trial to paint Britt as the most morally culpable coconspirator do not qualify as truly self-inculpatory. Suffice it to say that even if we could determine for the first time on appeal that Davis was unavailable, the result of this appeal would not be different.

---

[104]*Id.*

[105]See, *Williamson v. United States, supra* note 4, 512 U.S. at 603. Accord *U.S. v. Smalls*, 605 F.3d 765 (10th Cir. 2010). See, also, *United States v. Lang*, 589 F.2d 92 (2d Cir. 1978); *United States v. Bagley*, 537 F.2d 162 (5th Cir. 1976).

## 3. HARMLESS ERROR

[24] The trial court erred in admitting Davis' hearsay statements. In a jury trial of a criminal case, an erroneous evidential ruling results in prejudice to a defendant unless the State demonstrates that the error was harmless beyond a reasonable doubt.[106] We consider whether the erroneous admission of evidence is harmless beyond a reasonable doubt so that convictions are not set aside "for small errors or defects that have little, if any, likelihood of having changed the result of the trial."[107]

[25] In a harmless error review, an appellate court looks at the evidence upon which the jury rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather, whether the guilty verdict rendered in the trial was surely unattributable to the error.[108] In conducting this analysis, we look to the entire record and view the erroneously admitted evidence relative to the rest of the untainted, relevant evidence of guilt.[109]

[26,27] Overwhelming evidence of guilt can be considered in determining whether the verdict rendered was surely unattributable to the error, but overwhelming evidence of guilt is not alone sufficient to find the erroneous admission of evidence harmless.[110] We have also said that where evidence is cumulative and other competent evidence supports the conviction, improper admission or exclusion of evidence may be harmless.[111] Cumulative evidence tends to prove the same point of which other evidence has been offered; testimony lending credibility to a crucial witness' testimony will not necessarily be considered cumulative simply because another witness testifies similarly, however.[112]

While the untainted, relevant evidence without the inadmissible hearsay presented a "reasonably strong 'circumstantial web of evidence'"[113] against Britt, such evidence was not overwhelming. And that circumstantial web of evidence rested entirely on the credibility of witnesses who were all implicated in the crime and granted immunity for their testimony. Moreover, there was no physical evidence directly connecting Britt to the murders and Britt made no admissions.

Without Davis' inadmissible statements, the evidence concerning Britt's guilt consisted of the following: Logemann testified that he conspired with Davis to rob Miguel Sr. and that the money would be split with whomever Davis took with him to commit the robbery. Logemann testified that Britt was in the van when he showed Davis where Miguel Sr. lived and when

---

[106]See, *State v. Cullen*, 292 Neb. 30, 870 N.W.2d 784 (2015); *State v. Hughes, supra* note 67.

[107]*Chapman v. California*, 386 U.S. 18, 22, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967).

[108]*State v. Smith*, 292 Neb. 434, 873 N.W.2d 169 (2016).

[109]See *State v. DeJong*, 287 Neb. 864, 845 N.W.2d 858 (2014).

[110]See *id.*

[111]See *State v. Trice*, 292 Neb. 482, 874 N.W.2d 286 (2016).

[112]See, *id.*; *State v. Armstrong*, 290 Neb. 991, 863 N.W.2d 449 (2015).

[113]See *Chapman v. California, supra* note 107, 386 U.S. at 25.

Logemann and Davis discussed the planned robbery. This left the implication that Britt was the person Davis would take with him to commit the robbery. Jones, in constrast, testified that Britt was not in the van at that time.

Branch and Jones testified that Britt went into the Avalos house with Davis, with the understanding that they were going to buy drugs. When they returned, Branch said Britt asked if she had heard anything. Branch also testified that Britt ran back to the van wearing a bandanna over his face and gloves on his hands, but this was contradicted by Jones. At no point did Branch and Jones see either Davis or Britt with a weapon. The approximate time that Branch and Jones said they went to the Avalos house was the same approximate time that Miguel Sr.'s oldest son reported to the police that he heard intruders in the house.

Davis and Britt argued. Later, Davis was sick. Clairday picked Davis and Britt up, and Britt handed her a .22-caliber revolver when asked if he was carrying a gun. Davis was nervous and scared, and Britt at one point asked Davis "if he was losing him." Without objection, Clairday testified that Davis told her obliquely that "some things had happened that weren't supposed to happen" and that "some people got hurt that shouldn't have got hurt."

Clairday testified that she saw Britt burning gloves when they were at Lautenschlager's apartment. Once, in the days after the murders, she heard Davis and Britt converse in "hush tones."

At Clairday's direction, the .22-caliber revolver that Britt allegedly handed her was recovered by the police. There was no definitive forensic evidence connecting the gun to Britt or the murders, but .22-caliber bullets were used in the shootings.

Britt stayed in the basement with Jones until his arrest, and he was with Branch and Jones wherever they went. Jones and Logemann both testified that Britt made them nervous when he asked them personal questions, and Jones described Britt as "scary."

Relative to the above untainted, relevant evidence of guilt, the inadmissible hearsay statements were both numerous and significant. The State presented to the jury the following inadmissible hearsay statements by Davis:

Davis told Branch and Jones they needed to get out of town, because he "had to answer to other people," "it was out of his hands," and their safety was in jeopardy. Davis told Clairday he did not want her near Britt.

Davis explained that "Britt had brought a gun to the situation, and that that was never supposed to have went down like that"; that "they had went to rob somebody, and some things had happened that weren't supposed to happen"; and that "[Britt] was trigger happy." Davis said that while he was searching through one of the rooms of the Avalos house, "[Britt] went pop, pop, pop in the other room." Davis said that "everything went wrong" and that "[Britt] started shooting." Finally, Davis described in detail that

> they had went to the house to rob somebody, and that when they had gotten there, he was inside of a room going through stuff and he heard gunshots. He ran out into the hall, and [Britt] had met him in the hall. Somebody was coming down the hall and they started shooting.

Davis was heard asking over the telephone "where the other gun was." Davis was "worried about DNA because a gun got dropped."

The State relied heavily on these inadmissible hearsay statements in its closing argument. The statements provided the most direct eyewitness account of what occurred inside the Avalos house on the morning of the murders. The State also used these statements to place the bulk of the moral, if not legal, culpability upon Britt for the robbery's having gone so "horribly wrong."

Finally, the State relied upon these statements to connect Britt to the murder weapons. The State attempted to illustrate how the positions of the bodies and the number of shots fired from which weapons corresponded with Davis' narration of how the shootings took place. They also connected Davis' statements concerning a gun that was left at the scene and his worry about DNA being found on it with the fact that a gun apparently used in the murders was, in fact, found at the scene. Without these statements describing in detail how Britt started shooting and how Davis was concerned about where one of the guns was and whether DNA was on it, the only evidence connecting the presumed murder weapons to Britt were the facts that Britt handed Clairday a .22-caliber revolver later that day and that .22-caliber bullets were used in the shootings.

The State does not actually attempt to argue that the admission of all the hearsay statements we have deemed inadmissible would be harmless. The State's harmless error analysis instead relied on the assumption that most of these statements were admissible and that only a few statements were inadmissible and would be cumulative to the admissible statements. The State does not argue, and we cannot find, that the inadmissible hearsay statements, numbering over 30 in total, are cumulative to the one properly admitted hearsay statement that "something" had happened that should not have happened and that "some people" were hurt who should not have been hurt. Nor are they cumulative to the other admissible circumstantial evidence.

Britt's connection to the crimes is much clearer with the inadmissible hearsay statements than without those statements. The weight of the erroneously admitted evidence relative to the rest of the untainted, relevant evidence of guilt is significant. Therefore, we cannot conclude that the guilty verdict rendered in this trial was surely unattributable to the erroneous admission of Davis' inadmissible hearsay statements.

[28] We find that the admission of Davis' hearsay statements was reversible error. The Double Jeopardy Clause does not forbid a retrial so long as the sum of all the evidence admitted by a trial court, whether erroneously or not, would have been sufficient to sustain a guilty verdict.[114] Because the evidence presented at trial was sufficient to support the verdict against Britt, we conclude that double jeopardy does not preclude a remand for a new trial.

## VI. CONCLUSION

For the foregoing reasons, we reverse the judgment and remand the cause for a new trial consistent with this opinion.

REVERSED AND REMANDED.

HEAVICAN, C.J., not participating.

---

[114] *State v. Esch*, 290 Neb. 88, 858 N.W.2d 219 (2015).